1

2

3

4

5

6

7

8                        UNITED STATES DISTRICT COURT

9                       EASTERN DISTRICT OF CALIFORNIA

10

                              ----oo0oo----

11

12   SIERRA CLUB and FRIENDS OF THE    NO. CIV. 2:12-0044 WBS CKD
     WEST SHORE,
13
             Plaintiffs,               MEMORANDUM AND ORDER RE: CROSS-
14                                     MOTIONS FOR SUMMARY JUDGMENT
        v.
15
     TAHOE REGIONAL PLANNING AGENCY,
16   COUNTY OF PLACER, and BOARD OF
     SUPERVISORS OF THE COUNTY OF
17   PLACER,

18           Defendants.

19   _____

     HOMEWOOD VILLAGE RESORTS, LLC,
20   and JMA VENTURES, LLC,

21           Defendants and Real
             Parties in Interest.
22   _____/

23

24                            ----oo0oo----

25          Plaintiffs Sierra Club and Friends of the West Shore

26   ("FOWS") brought this action against defendants the County of

27   Placer, the Board of Supervisors of the County of Placer

28   ("County"), the Tahoe Regional Planning Agency ("TRPA"), Homewood

                                    1

1  Village Resorts, LLC, and JMA Ventures, LLC (collectively,

2  "defendants"), alleging violations of the California

3  Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code § 21000-

4  21176 and the Tahoe Regional Planning Compact ("Compact"), Pub.

5  L. No. 96-551, 94 Stat. 3233 (1980); Cal. Gov't Code § 66801 et

6  seq.; Nev. Rev. Stat. § 277.200 et seq.  Plaintiffs' allegations

7  pertain to TRPA and the County's approval of the Homewood Ski

8  Area Master Plan (the "Project"), which allows for the expansion

9  of the Homewood Mountain Resort in Homewood, California.

10 Presently before the court are plaintiffs' motion for summary

11 judgment and defendants' cross-motions for summary judgment

12 pursuant to Federal Rule of Civil Procedure 56.

13 I.    Introduction and Facts

14       A.    Compact and TRPA's Regulation

15            The Lake Tahoe Region ("Region") is located on the

16 California-Nevada border and comprises about 501 square miles,

17 including the waters of Lake Tahoe, which cover 191 square

18 miles.[1]  (RP at i.)  The primary focus of environmental

19 regulation in the Region is to protect the exceptional water

20 clarity of the lake.  Id.  Homewood is a town on the lake's west

21 shore and lies within Placer County, California.

22            In 1968, California and Nevada entered into the

23 Compact, which was approved by Congress in 1969.  League to Save

24 Lake Tahoe v. Tahoe Reg'l Planning Agency, 739 F. Supp. 2d 1260,

25 1265 (E.D. Cal. 2010) ("League") (Karlton, J.), aff'd in part,

26 vacated in part, remanded, 469 F. App'x 621 (9th Cir. 2012).  The

27 _____

28        [1]   The Regional Plan, (Administrative Record ("AR") 13760-
       696), is cited as "RP at [internal page number]."

2

Compact guides all planning and development in the Region and was
amended in 1980 to direct TRPA, the agency it created, "to
establish environmental threshold carrying capacities" for the
Region.  (Compl. Ex. A ("Compact") art. I(b)(Docket No. 1).)  The
"environmental threshold carrying capacities" are environmental
standards "necessary to maintain a significant scenic,
recreational, educational, scientific or natural value of the
region or to maintain public health and safety within the region"
and "shall include but not be limited to standards for air
quality, water quality, soil conservation, vegetation
preservation and noise."  (Id. art. II(i).)  TRPA has adopted
thirty-six threshold standards, including standards for water
quality, air quality, noise, and scenic quality.  (See
Administrative Record ("AR") 12879 (TRPA Resolution adopting
thresholds).)

        The Compact also required TRPA "to adopt and enforce a
regional plan and implementing ordinances which will achieve and
maintain [the thresholds] while providing opportunities for
orderly growth and development consistent with such capacities."
(Compact art. I(b).)  In 1987, TRPA adopted the Regional Plan,
which describes the needs and goals of the Region and provides
policies to guide action affecting the Region's resources.  (RP
at iii.)  The Regional Plan is implemented by the Code of
Ordinances and the Rules of Procedure promulgated by TRPA.  See
Comm. for Reasonable Regulation of Lake Tahoe v. Tahoe Reg'l
Planning Agency, 311 F. Supp. 2d 972, 979-80 (D. Nev. 2004).

        TRPA also has regulatory authority over specific
projects.  For each project that may have a significant effect on

1  the environment, TRPA must adopt findings that the project will

2  not interfere with implementation of the Regional Plan or cause

3  the thresholds to be exceeded.  (Compact art. V(g).)  TRPA must

4  also prepare an environmental impact statement ("EIS") for the

5  project, similar to that required by CEQA, identifying the

6  project's significant environmental impacts, the impacts that

7  cannot be avoided if the project is implemented, alternatives to

8  the project, and mitigation measures that must be implemented to

9  assure meeting the standards of the region, among other things.

10  (Id. art. VII(a)(2)(A)-(D).)

11          Changes to TRPA's implementing documents require

12  particular findings.  When TRPA amends the Regional Plan, it must

13  find "that the Regional Plan, as amended, achieves and maintains

14  the thresholds."[2]  (Park Decl. Ex. 1 ("Code") § 6.4 (Docket No.

15  40).)  Likewise, when it amends the Code, it must find that "the

16  Regional Plan, and all of its elements, as implemented through

17  the Code, Rules, and other TRPA plans and programs, as amended,

18  achieves and maintains the thresholds."  Id. § 6.5.

19      B.   Homewood Project

20          Homewood was developed in about 1900 as a vacation

21  resort.  (AR 3105.)  It is mainly a residential town, with only

22  906 residents in 2004.  (Id. at 3005, 3119.)  The Homewood

23  Mountain Resort ("Resort" or "HMR") opened in 1962 and is the

24  largest tourism feature in the town.  (Id. at 3119, 12733.)  It

25  has four main chairlifts and two distinct lodge areas, the South

26  Base and North Base.  (Id. at 7351.)  It is primarily a "day ski"

27

28          [2]   The court cites to the Code in effect at the time of
    the Project approvals.

4

1  area because it has no overnight accommodations.  (Id. at 40478.)

2       In 2006 and 2007, the owners of the resort, JMA

3  Ventures and Homewood Village Resorts LLC (collectively, "JMA"),

4  proposed the Project, a planned expansion of the Resort from

5  25,000 square feet to over one million square feet that would add

6  325 new residential and tourist accommodation units to the

7  surrounding Homewood community.  (Id. at 2691-92, 3481.)  The

8  Project is intended to update the Resort's ski facilities and

9  bring new development rights, including commercial floor area,

10  residential units, and tourist accommodation units, to the

11  Project area, which currently has no residential or tourist

12  accommodation units.  (Id. at 3119.)  The Resort is currently

13  operating at a loss, and the Project is also designed to generate

14  enough revenue to fund the environmental benefits the Project

15  will bring and ensure its continued economic viability.  (Id. at

16  2749, 18968.)

17       In February 2008, TRPA's Governing Board accepted the

18  Project into the "Community Enhancement Program" ("CEP"), which

19  was created to provide incentives to developers to create "mixed-

20  use, transit-orientated development" in the Region.  (Id. at

21  7351.)  It grants projects development rights--bonus commercial

22  floor area allocations and bonus tourist accommodation units

23  ("TAUs")--from a pool reserved for projects that provide a

24  "substantial environmental benefit" or "mitigation in excess" of

25  legal requirements.[3]  See Code §§ 33.3.D(3)(C)(ii), 33.4.A(3).

26

27      [3]  "Additional" TAUs are any TAUs created after 1987; they
28  require an allocation from TRPA.  Code § 33.4.A.  For projects
    meeting certain criteria, "bonus" TAUs are awarded by TRPA when

1   For the Project to participate in this program, TRPA adopted a
2   resolution listing the minimum requirements it must meet.  (AR
3   2680.)   The benefits the Project will provide include water
4   quality improvements, retirement of sensitive lands, and an
5   overall reduction in land coverage.  (Id. at 3920; see also AR
6   2977-79 (noting other Project benefits).)

7           To meet the environmental review requirements of both
8   CEQA and the Compact, the County and TRPA jointly issued the
9   draft environmental impact report-environmental impact statement
10  ("EIR-EIS") in January 2011.  (Id. at 239.)   The draft studied
11  the proposed Project and five alternatives, including a "reduced
12  project alternative," which proposed a fifteen percent reduction
13  in development for a total of 297 residential and tourist
14  accommodation units.  (Id. at 268-70.)   The proposed project
15  required several land-use planning amendments to the Regional
16  Plan, Code, and Plan Area Statements ("PASs").[4]   These amendments
17  are considered part of the proposed project and were analyzed
18  during the Project's environmental review.  (See id. at 3926.)
19  They include amendments to the Regional Plan and to the Code to
20  remove the requirement that additional TAUs in a ski area be
21  allocated only under an adopted community plan, (id. at 36-61);
22  amendments to several PASs for the Resort to expand its urban
23  boundary, (id. at 358, 540-41); and additional Code amendments to
24  allow additional height and groundwater interception for below-

25  _____

26  at least one existing TAU is transferred for each TAU bonus unit
    received.  Id. § 35.3.
27

28      [4]   Note that the Project entailed a new ski area master
    plan, which is itself an amendment to the Regional Plan.

6

1  grade parking in the proposed project's areas, (id. at 360-61).[5]

2          In October 2011, TRPA and the County issued the final

3  EIR-EIS.  (Id. at 2675-7333.)   It modified the proposed project,

4  "Alternative 1A," to meet concerns raised during the comment

5  period.  (Id. at 2756.)   The same amendments remained necessary.

6  (Id. at 2788-89.)   The EIR-EIS found that neither the reduced

7  alternative (Alternative 6), nor any smaller project, would

8  produce enough revenue to support the Project's proposed

9  environmental improvements and ensure the continued viability of

10 the ski operations.  (Id. at 326.)   Later in October, the County

11 approved the Project and the EIR-EIS.  (Id. at 9236, 9245.)

12 Plaintiffs appealed both.  (Id. at 8311.)   The County denied the

13 appeal and certified the EIR-EIS. (Id. at 41-42.)   On December

14 14, 2011, TRPA held a hearing on the Project.  (TRPA

15 Administrative Record ("TAR") at 205-07.)   It certified the EIR-

16 EIS, approved the amendments, and approved the Project.  (Id. at

17 1017-21.)

18 II.  Legal Standard

19          Although the parties bring cross-motions for summary

20 judgment, this is a record-review case and there are no material

21 facts in dispute.[6]   The ordinary standards for summary judgment

22

23          [5]    The Regional Plan consists of the "Goals and Policies"
   document and the Code.  For ease, amendments to the "Goals and
24 Policies" are referred to as amendments to the Regional Plan and
   amendments to the Code are referred to as such.
25

26          [6]    Defendants request that the court take judicial notice
   of the final 2011 Threshold Evaluation Report.  (Defs.' Req. for
27 Judicial Notice Ex. A (Docket No. 58).)   Plaintiffs object to
   this request.  (Pls.' Obj. to Req. for Judicial Notice (Docket
28 No. 63).)  Defendants suggest that the court consider this
   exhibit as indicating the truth or falsity of agency predictions.

1  are therefore not implicated.  League, 739 F. Supp. 2d at 1267.

2  Instead, the court must determine whether either party is

3  entitled to judgment as a matter of law.  Id.

4      A.   CEQA

5          CEQA is "a comprehensive scheme designed to provide

6  long-term protection to the environment."  Napa Citizens for

7  Honest Gov't v. Napa Cnty. Bd. of Supervisors, 91 Cal. App. 4th

8  342, 355 (2001).  Its provisions are fleshed out by the

9  "Guidelines" set forth in the California Code of Regulations,

10 title 14, section 15000 et seq. ("Guidelines").[7]  CEQA is to be

11

12 The court declines to adopt this rationale for considering this
   exhibit.  See League, 739 F. Supp. 2d at 1264 n.1.  Defendants
13 also request that the court take judicial notice of ozone
   monitoring reports from the U.S. Environmental Protection Agency.
14  (Defs.' Req. for Judicial Notice Ex. B (Docket No. 47-2).)  The
   court declines to consider this report for the same reason.
15 Relatedly, defendants request judicial notice of TRPA Resolution
   2012-17 and Findings, which issued the final 2011 Threshold
16 Evaluation Report.  (Defs.' Req. for Judicial Notice Ex. A
   (Docket No. 66).)  Because the court does not rely on the 2011
17 Threshold Evaluation Report, it need not decide whether to
   consider this document, which is offered for the purpose of
18 urging the court to take judicial notice of the 2011 Threshold
   Evaluation Report.
19      Defendants also request judicial notice of a state
   court decision, California Clean Energy Committee v. County of
20 Placer, (Defs.' Req. for Judicial Notice Ex. 1 (Docket No. 59)),
   and a TRPA staff report, September 2007 Staff Report to TRPA
21 Governing Board re: Amendment of Chapter 82, Water Quality
   Mitigation and Amendment of Chapter 93, Traffic and Air Quality
22 Mitigation Program, to Raise the Mitigation Fees to Reflect
   Increased Cost of Construction, (id. Ex. 2).  Plaintiffs object
23 to both requests.  (Pls.' Obj. to Req. for Judicial Notice.)
   The court finds that judicial notice of the decision is proper
24 only for the fact of its existence.  Cal. ex rel. RoNo, LLC v.
   Altus Fin. S.A., 344 F.3d 920, 931 (9th Cir. 2003).  The court
25 does not consider the TRPA report to reach its conclusions and
   therefore need not determine whether it is properly subject to
26 judicial notice.

27     [7]   The California Supreme Court recently reaffirmed: "In
   interpreting CEQA, we accord the Guidelines great weight except
28 where they are clearly unauthorized or erroneous."  Vineyard Area

                                8

interpreted in a manner that gives the fullest possible
protection to the environment within the scope of the statutory
language. <u>Citizens of Goleta Valley v. Bd. of Supervisors</u>, 52
Cal. 3d 553, 563 (1990) ("<u>Goleta I</u>").  The environmental impact
report ("EIR") is described as the "heart of CEQA;" its purpose
is to inform the public and government officials of the
environmental consequences of decisions before they are made.
<u>Laurel Heights Improvement Ass'n v. Regents of Univ. of Cal.</u>, 47
Cal. 3d 376, 392 (1988) ("<u>Laurel Heights</u>").  It requires project
proponents to "identify ways that environmental damage can be
avoided or significantly reduced" and assists to "[p]revent
significant, avoidable damage to the environment by requiring
changes in projects through the use of alternatives or mitigation
measures when the governmental agency finds the changes to be
feasible."  Guidelines § 15002(a)(2)-(3).

Under CEQA, the court's review is generally limited to
ascertaining whether the public agency abused its discretion by
not proceeding as required by law or by making a determination
that is not supported by substantial evidence.  Cal. Pub. Res.
Code §§ 21168, 21168.5; <u>Californians for Alternatives to Toxics
v. Dep't of Food & Agric.</u>, 136 Cal. App. 4th 1, 12 (1st Dist.
2005) ("<u>CATS</u>").  Judicial review of these two kinds of error is
very different.  <u>Cal. Native Plant Soc. v. City of Santa Cruz</u>,
177 Cal. App. 4th 957, 984 (6th Dist. 2009).  Thus, "a reviewing
court must adjust its scrutiny to the nature of the alleged
defect, depending on whether the claim is predominantly one of

---

<u>Citizens for Responsible Growth, Inc. v. City of Rancho Cordova</u>,
40 Cal. 4th 412, 428 n.5 (2007).

improper procedure or a dispute over the facts." <u>Vineyard Area</u>
<u>Citizens for Responsible Growth, Inc. v. City of Rancho Cordova</u>,
40 Cal. 4th 412, 435 (2007) ("<u>Vineyard Area Citizens</u>").

An agency fails to proceed in a manner required by law
when it fails to comply with the informational requirements of
CEQA. <u>CATS</u>, 136 Cal. App. 4th at 12. The court determines <u>de</u>
<u>novo</u> whether the agency used the correct procedures in taking the
challenged action. <u>Cal. Native Plant Soc.</u>, 177 Cal. App. 4th at
984. "Substantial evidence" is "enough relevant information and
reasonable inferences from this information that a fair argument
can be made to support a conclusion, even though other
conclusions might also be reached." Guidelines § 15384(a).
Under this standard, the court "accord[s] greater deference to
the agency's substantive factual conclusions." <u>Vineyard Area</u>
<u>Citizens</u>, 40 Cal. 4th at 435. It "'resolve[s] reasonable doubts
in favor of the administrative finding and decision.'" <u>Laurel</u>
<u>Heights</u>, 47 Cal. 3d at 393 (quoting <u>Topanga Ass'n for a Scenic</u>
<u>Cmty. v. Cnty. of Los Angeles</u>, 11 Cal. 3d 506, 514 (2d Dist.
1974)). It is not for the court to determine the correctness of
the EIR's environmental conclusions, but rather only its
sufficiency as an informative document. <u>Laurel Heights</u>, 47 Cal.
3d at 392. Thus, the court cannot overturn an agency's approval
of an EIR because an opposite conclusion would have been equally
or even more reasonable. <u>CATS</u>, 136 Cal. App. 4th at 645.

"An EIR will be found legally inadequate--and subject
to independent review for procedural error--where it omits
information that is both required by CEQA and necessary to
informed discussion." <u>Cal. Native Plant Soc.</u>, 177 Cal. App. 4th

10

at 986.   In contrast, the usual dispute will "concern the amount
or type of information contained in the EIR, the scope of the
analysis, or the choice of methodology."   Id.   This is a factual
determination that receives substantial evidence review.   San
Joaquin Raptor Rescue Ctr. v. Cnty. of Merced, 149 Cal. App. 4th
645, 654 (5th Dist. 2007).

        CEQA's exhaustion requirement is characterized by
California courts as jurisdictional.   Cal. Native Plant Soc. v.
City of Rancho Cordova, 172 Cal. App. 4th 603, 615 (3d Dist.
2009).   Plaintiffs may not raise an issue in litigation unless it
was first presented to the agency.   Cal. Pub. Res. Code §
21177(a).   "[T]he objections must be sufficiently specific so
that the agency has the opportunity to evaluate and respond to
them."   Tracy First v. City of Tracy, 177 Cal. App. 4th 912, 926
(3d Dist. 2009) (alteration in original) (internal quotation
marks and citation omitted).   The burden is on plaintiffs to show
the issues they raise before the court were first raised before
the agency.   Id.

        B.   Compact

        Under the Compact, the applicable standard of review
for an agency's adjudicatory act or decision to approve or
disapprove a project is "prejudicial abuse of discretion," which
is established when "the agency has not proceeded in manner
required by law or if the act or decision of the agency was not
supported by substantial evidence in light of the whole record."
(Compact art. VI(j)(5).)   In making this determination, the court
should "not exercise its independent judgment on evidence" but
rather "only determine whether the act or decision was supported

11

1   by substantial evidence."  (Id.)  The applicable standard of

2   review for a legislative act or decision of the agency extends

3   only to whether the act or decision was arbitrary, capricious, or

4   without substantial evidence or whether the agency failed to

5   proceed in a manner required by law.  (Id.)

6       The Compact does not contain a statutory issue-

7   exhaustion requirement.  It provides that "any aggrieved person

8   may file an action" that "alleg[es] noncompliance with the

9   provisions of this compact."  (Id. art. VI(j)(3).)  An

10  "'aggrieved person' means any person who has appeared . . .

11  before the agency at an appropriate administrative hearing to

12  register objection to the action which is being challenged . . .

13  ."  (Id.)  Cases finding a statutory issue-exhaustion requirement

14  rely on language that clearly demands objection to a particular

15  issue, rather than to the challenged action.  See, e.g., Woelke &

16  Romero Framing, Inc. v. NLRB, 456 U.S. 645, 665 (1982) (finding

17  an issue-exhaustion requirement where statutory language provided

18  that "'[n]o objection that has not been urged before the Board .

19  . . shall be considered by the court, unless the failure or

20  neglect to urge such objection shall be excused because of

21  extraordinary circumstances'" (quoting 29 U.S.C. § 160(e)));

22  Wash. Ass'n for Television & Children v. FCC, 712 F.2d 677, 681

23  (D.C. Cir. 1983) (locating issue-exhaustion requirement in

24  statutory language providing that "'[t]he filing of a petition

25  for rehearing shall not be a condition precedent to judicial

26  review of [an FCC decision] except where the party seeking such

27  review . . . relies on questions of law or fact upon which the

28  Commission . . . has been afforded no opportunity to pass'"

12

1  (quoting 47 U.S.C. § 405 (second alteration in original))); <u>see</u>

2  <u>also</u> <u>id.</u> at 681 n.6 (collecting statutes).[8]  The Compact's

3  provision does not use words or phrases comparable to "issue" or

4  "grounds for objection," which would indicate that the statute

5  requires objection to a particular issue before the agency if

6  that issue is to be raised during litigation.

7       Instead, the Compact's provision regarding aggrieved

8  persons sets limitations on who may challenge TRPA's decisions

9  under the statute.  <u>See</u> <u>Dir., Office of Workers' Comp. Programs,</u>

10 <u>Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.</u>, 514

11 U.S. 122, 126 (1995) ("<u>Newport News</u>") ("The phrase 'person

12 adversely affected or aggrieved' is a term of art used in many

13 statutes to designate those who have standing to challenge or

14 appeal an agency decision, within the agency or before the

15 courts.").  The judicial review provision of the Administrative

16 Procedure Act ("APA"), 5 U.S.C. § 702, entitles "[a] person . . .

17 adversely affected or aggrieved by agency action within the

18 meaning of a relevant statute" to judicial review.  "In that

19 provision, the qualification 'within the meaning of a relevant

20 statute' is not an addition to what 'adversely affected or

21 aggrieved' alone conveys; but is rather an acknowledgment of the

22 fact that what constitutes adverse effect or aggrievement varies

23 from statute to statute."  <u>Newport News</u>, 514 U.S. at 126.  The

24 

25       [8]   Defendants cite <u>Unemployment Compensation Commission of</u>
   <u>Alaska v. Aragon</u>, 329 U.S. 143 (1946), as interpreting a statute
26 worded similarly to the Compact to require issue exhaustion.
   However, the Supreme Court distinguished that case in <u>Sims v.</u>
27 <u>Apfel</u>, 530 U.S. 103 (2000), explaining that it "spoke favorably
   of issue exhaustion in [<u>Aragon</u>], without relying on any statute
28 or regulation . . . ."  <u>Id.</u> at 2085.

1  Compact appears to contemplate the model proposed by the APA; by

2  defining "aggrieved person," it delineates who has standing under

3  the statute.

4          Even where administrative issue exhaustion is not

5  statutorily required, a court may apply a "judicially imposed

6  issue-exhaustion requirement." Sims v. Apfel, 530 U.S. 103, 108

7  (2000).[9]  Whether a court should impose such a requirement

8  depends on the extent to which the particular administrative

9  proceeding is analogous to normal adversarial litigation. Id. at

10  109-10.  However, even though there is no statutory issue

11  exhaustion requirement in the National Environmental Policy Act

12  ("NEPA") and it does not provide for any procedures akin to an

13  adversarial proceeding, the Supreme Court has imposed an issue-

14  exhaustion requirement for NEPA plaintiffs. Dep't of Transp. v.

15  Pub. Citizen, 541 U.S. 752, 764 (2004); see Lands Council v.

16  McNair, 629 F.3d 1070, 1076 (9th Cir. 2010) ("A party forfeits

17  arguments that are not raised during the administrative

18  process."); see also High Sierra Hikers Ass'n v. U.S. Forest

19  Serv., 436 F. Supp. 2d 1117, 1148 (E.D. Cal. 2006) (explaining

20  that Sims's test for applying a judicially imposed issue-

21  exhaustion requirement has been narrowed by Public Citizen).  As

22  the Court explained, "[p]ersons challenging an agency's

23  compliance with NEPA must 'structure their participation so that

24

25          [9]    Plaintiffs cite Montes v. Thornburgh, 919 F.2d 531 (9th
   Cir. 1990), for a three-part test that a court may use to
26  determine if it should apply a prudential issue-exhaustion
   requirement.  However, the Montes test is for the exhaustion of
27  administrative remedies, rather than issue exhaustion. Id. at
   537. Cf. Sims, 530 U.S. at 107 (explaining that the issue-
28  exhaustion requirement is not necessarily "an important
   corollary" of any requirement of remedy exhaustion).

14

1  it . . . alerts the agency to the [parties'] position and

2  contentions,' in order to allow the agency to give the issue

3  meaningful consideration." <u>Public Citizen</u>, 541 U.S. at 764

4  (quoting <u>Vermont Yankee Nuclear Power Corp. v. Natural Res. Def.</u>

5  <u>Council, Inc.</u>, 435 U.S. 519, 543 (1978) (alterations in

6  original)).

7       The purpose of requiring issue exhaustion is to allow

8  "administrative agencies to utilize their expertise, correct any

9  mistakes, and avoid unnecessary judicial intervention in the

10 [administrative] process." <u>Lands Council</u>, 629 F.3d 1070 at 1076.

11 As explained, the Compact, like NEPA, does not have an issue-

12 exhaustion provision.  However, as in the NEPA context, the

13 Compact requires the preparation of an EIS, which facilitates

14 public comments and responses by the agency.  The EIR-EIS process

15 here provided plaintiffs with an opportunity to raise the issues

16 they considered relevant and allowed TRPA to give "meaningful

17 consideration" to those issues.  There was an opportunity for

18 TRPA to use its expertise, correct its mistakes, and avoid otiose

19 judicial intervention.  Because the Compact's EIS requirements

20 provide for public participation and agency response to the same

21 extent as does NEPA, and allow for the purposes of issue

22 exhaustion to be met, the court finds that an issue-exhaustion

23 requirement applies.[10]

24 III.  <u>Amendments to the Regional Plan and Code</u>

25       A.    <u>Legal Standard</u>

26

27       [10]    The court does not decide if the issue-exhaustion
   requirement applies in the absence of the environmental review
28 process.

1        Under Article VI(j)(5) of the Compact, the scope of
2 judicial review of legislative acts or decisions by TRPA extends
3 only to questions of whether the act or decision was "arbitrary,
4 capricious or lacking substantial evidentiary support or whether
5 the agency has failed to proceed in a manner required by law."
6 Both parties draw on cases interpreting the scope of the court's
7 review under the APA to explain the extent of the court's review
8 under the Compact.  This is reasonable given the similar language
9 of the judicial review sections of the APA and the Compact.  See
10 5 U.S.C. § 706(2)(A), (E); League, 739 F. Supp. 2d at 1267
11 (noting that the parties characterize the standard of review as
12 essentially the same as that used under the APA and citing APA
13 caselaw).[11]

14        An agency's legislative action is considered arbitrary
15 and capricious when the agency relied "on factors which Congress
16 has not intended it to consider, entirely failed to consider an
17 important aspect of the problem, offered an explanation for its
18 decision that runs counter to the evidence before the agency, or
19 is so implausible that it could not be ascribed to a difference
20 in view or the product of agency expertise."  Motor Vehicle Mfrs.
21 Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S.
22 29, 43 (1983).  Under this standard, the court's scope of review
23 is narrow and it must not "substitute its judgment for that of
24 the agency."  Id.

25 _____

26        [11]    Judicial review under the APA requires a court to set
aside agency actions, findings, and conclusions found, among
other things, to be "arbitrary, capricious, an abuse of
27 discretion, or otherwise not in accordance with law" or
"unsupported by substantial evidence."  5 U.S.C. § 706(2)(A),
28 (E).

16

1    The parties dispute whether the prohibition against
2   agency "ad hocery" also applies only to agency adjudicative
3   actions or also to TRPA's legislative actions.  In Ramaprakash v.
4   FAA, 346 F.3d 1121 (D.C. Cir. 2003), the court explained that
5   "the core concern underlying the prohibition of arbitrary or
6   capricious agency action is that agency 'ad hocery' is
7   impermissible."  Id. at 1130 (internal quotation marks and
8   citation omitted).  It held that the National Transportation
9   Safety Board ("NTSB") engaged in such ad hocery when it departed
10  from its precedent without any reasoned explanation in deciding
11  whether the Federal Aviation Administration could suspend
12  Ramaprakash's pilot certificate.  Id. at 1125.  Most
13  consequentially, the NTSB abandoned its decades-old requirement
14  of prosecutorial diligence in investigating possible violations
15  of the Federal Aviation Regulations.  Id. at 1127-28.  It also
16  indicated that whether the departures announced in Ramaprakash's
17  case would apply in the future would depend on the facts of
18  specific cases.  Id. at 1130.  The court expressed dismay at the
19  resulting uncertainty, concluding:

20       We have it on high authority that "the tendency of the
         law must always be to narrow the field of uncertainty."
21       O.W. Holmes, The Common Law 127 (1881).  The Board's
         unexplained departures from precedent do the opposite.
22       "[W]here an agency departs from established precedent
         without a reasoned explanation, its decision will be
23       vacated as arbitrary and capricious."

24  Id. at 1130 (second citation omitted).

25       Defendants attempt to cordon off "ad hocery" as a
26  specific restraint on agencies only in their adjudicative
27  actions, but the court does not give the phrase such talismanic
28  significance.   The challenge in Ramaprakash to the policy change

                                17

evident in the NTSB's adjudicatory determination was brought under § 706(2)(A) of the APA, which prohibits arbitrary and capricious action.  Id. at 1124.  State Farm interpreted the same provision and required a comparable explanation for an agency's legislative act that marked a change in course: "a reasoned analysis for the change."  463 U.S. at 42 (reviewing agency's promulgation of an informal rule); see also Redding Rancheria v. Salazar, --- F. Supp. 2d ----, 2012 WL 525484, at *12 (9th Cir. Feb. 16, 2012) (explaining that an agency changing course in its regulations must provide an explanation for the change). Ramaprakash and State Farm reviewed different kinds of agency actions, but the point from both decisions is the same: agencies should provide reasonable explanations when they embark on policy change.  If there is any difference between an agency's failure to explain change under Ramaprakash and State Farm, it would seem to be only that an agency engaging in ad hocery commits a more blatant violation of the prohibition against arbitrary and capricious agency action such that the course its policy will follow is wholly unpredictable.

        The similarity between the standards is borne out by subsequent caselaw.  In American Federation of Labor v. Chertoff, 552 F. Supp. 2d 999 (N.D. Cal. 2007), the court considered whether the Department of Homeland Security acted arbitrarily and capriciously in promulgating a final rule that departed from its historical position regarding the knowledge imputed to employers who receive no-match letters from the Social Security Administration ("SSA") indicating that an employee's name and Social Security Number on a wage form do not match the SSA's own

18

1  records.[12]  Id. at 1009.  Although it did not use the phrase "ad

2  hocery," the court quoted Ramaprakash for the proposition that:

> 3  [A]gency action is arbitrary and capricious if it departs
> from agency precedent without explanation.  Agencies are
> 4  free to change course as their expertise and experience
> may suggest or require, but when they do so they must
> 5  provide a reasoned analysis indicating that prior
> policies and standards are being deliberately changed,
> 6  not casually ignored.

7  Id. at 1009 (quoting Ramaprakash, 346 F.3d at 1124-25).  Even

8  though Chertoff considered an agency's legislative action, it

9  relied on Ramaprakash without qualification, affirming the

10  court's determination that there is no significant difference

11  between what State Farm requires and "ad hocery" prohibits.

12  Assuming, however, that some heightened standard under

13  Ramaprakash applies, for the reasons explained below, the court

14  finds that TRPA did not violate even this.

15      B.   TRPA's Adoption of Amendments to Expand Access to TAUs

16           Prior to constructing new tourist accommodations, such

17  as hotels, the Regional Plan and Code require that developers

18  first receive an allocation of TAUs.  (RP at II-5); Code §

19  33.4.A.  Before the Project's approval, the Regional Plan

20  required that projects "be permitted additional [TAUs] as

21  specified within a community plan," (RP at II-5), and that "[n]o

22  bonus [TAUs] shall be allowed for projects outside adopted

23  community plans," (id. at VII-15; see also id. at II-5 ("Based on

24  demonstrated need, projects may be permitted additional [TAUs] as

25  specified within a community plan.")).  Likewise, the Code

26  ─────────────

27  [12]    Although Chertoff analyzed the agency's action for
purposes of a preliminary injunction motion, the court cites the
case only for its statement of the law.  See 552 F. Supp. 2d at
28  1009-10.

required that bonus TAUs be limited to "projects" and "parcels" within adopted community plans.  Code §§ 33.4.A.(3), 35.3. Additionally, most of the Project is located in PAS 157, which requires that "[a]ny new or additional commercial uses shall be permitted only pursuant to an adopted [c]ommunity [p]lan."  (AR 2962.)

PASs guide planning by setting the land-use requirements for the different areas of the Region.  (RP at I-5.) Certain areas within the Region are designated by the Regional Plan as eligible for community plans, which may be adopted to supersede a PAS.  (Id.)  Adoption of a community plan is not mandatory, (id. at II-6), but may commence "as a result of a local government request, or by Agency initiative in recognition of local interest," (id. at II-7); see also Code § 14.6.A(1). Among other elements, community plans must include an "assessment of needs, opportunities, limitations, and existing features" and a "statement of goals and objectives for the area."  (RP at II-7.)  "It is [TRPA's] goal that each proposed community plan . . . will have addressed the needs and concerns of the community . . . ."  (Id. at II-8.)  A "master plan" is another kind of detailed plan that is intended "to augment [PASs] or community plans" and "to provide more detailed planning to ensure that projects and activities are consistent with the Goals and Policies [of the Regional Plan], the [PASs] or community plans, and the Code.[13]

---

[13]    Under the Plan, land use classifications include conservation, recreation, residential, commercial and public service, and tourist areas.  (RP at II-3-4.)  The chosen classifications set the allowable land uses within the PAS.

1   Code § 16.0.  It may also replace the PAS.[14]  (RP at I-5.)

2           Homewood was an area identified for community planning

3   and part of the Project area is designated as "a preliminary

4   community plan area," meaning it is eligible for a community

5   plan.  (See AR 2964, 19063, 19072.)  Homewood, however, does not

6   currently have a community plan, and at the time the Project was

7   proposed, some commentators requested a plan be adopted.  (Id. at

8   1471, 1479, 1531 (commenting on Notice of Preparation of Draft

9   EIR-EIS); TAR 9962.)  Instead of preparing a community plan for

10  the area, TRPA amended the Regional Plan and Code to allow

11  allocation of additional TAUs under either a community plan "or a

12  ski area master plan," as well as Plan Area 157 to allow new or

13  additional commercial uses pursuant to either type of plan

14  (collectively, the "Amendments").[15]  (See id. at 224, 623, 644-

15  45.)

16          Plaintiffs argue that the "new alternative" for

17  allocating TAUs and commercial floor area through the ski area

18  master plan process fails to satisfy the objectives of the

19  Compact and Regional Plan.  (Pls.' Mem. in Supp. of Summ. J.

20  ("Pls.' Mem.") at 14:24 (Docket No. 40-1).)  They view the

_____

22      [14]   The Code has an apparently contradictory requirement:
    "Specific or master plans shall supplement, but shall not
23  replace, plan area statements and community plans . . . ."  Code
    § 16.5.
24

25      [15]   In their reply, plaintiffs depart from the argument
    made in their opening brief that TRPA's decision not to create a
26  community plan "was arbitrary and unlawful."  (Pls.' Mem. in
    Supp. of Summ. J. ("Pls.' Mem.") at 14:3-7 (Docket No. 40-1).)
27  In their reply, they clarify that they object that "TRPA changed
    the rules for obtaining additional development rights in ski
    areas without any rational justification."  (Pls.' Reply at 3:6-7
28  (Docket 55-1).)

1   Compact and Regional Plan as mandating regional planning to take

2   into account the Region's needs "as a whole" and requiring

3   consideration of community needs before approval of additional

4   development.  They argue that because master plans are not

5   designed to be responsive to the Region's and community's needs,

6   TRPA's adoption of the Amendments marks a departure from TRPA's

7   prior practice.  In other words, TRPA has departed from its

8   former policy in two ways: (1) the Region's and community's needs

9   are no longer considered in land-use planning, despite the

10  Compact and Regional Plan's clear intent that they be considered

11  and (2) those needs are no longer determined through the

12  community planning process.  (Pls.' Reply 3:5-10 (Docket 55-1).)

13  Finally, plaintiffs argue that TRPA departed from that practice

14  without explaining why it changed its course; that is, "without

15  any rational justification."  (Id. at 3:6-7.)

16          Initially, defendants dispute that TRPA changed course

17  or reversed its policy such that an explanation of the change is

18  required.  A reversal would more clearly be before the court if

19  TRPA had approved amendments to prohibit allocation of TAUs

20  through community plans and instead distribute them only through

21  the ski area master plan process, or if it had previously found

22  that ski area master plans should not be used to allocate TAUs.

23  TRPA instead suggests that it merely expanded incentives that it

24  previously found to be environmentally beneficial.  Cf. Redding

25  Rancheria, 2012 WL 525484, at *12 (analyzing agency's decision to

26  apply temporal limitation as a bright-line rule rather than on a

27  case-by-case basis as a change in course).

28          In setting out the required findings for the

22

1   Amendments, TRPA explained that the amendments to the Regional

2   Plan are consistent with the existing Regional Plan because they

3   "will facilitate implementation of the Regional Plan, in terms of

4   both threshold attainment and orderly growth and development, by

5   providing incentives for an economically, environmentally and

6   socially sustainable project that results in threshold-related

7   improvements . . . ."  (TAR 678.)  It stated further that:

8        The amendments do not increase the fixed number of bonus
         units originally allocated in the Regional Plan.
9        Further, just as is required for projects in Community
         Plans, projects in Ski Area Master Plans proposing to use
10       bonus units must demonstrate substantial environmental
         benefits and provide a match of existing tourist
11       accommodation units through a transfer pursuant to Code
         Chapter 34.  As such, the proposed amendments expand
12       incentives already embodied in the Regional Plan to Ski
         Area Master Plans to realize environmental gain.

13

14  (Id. at 678.)  There is substantial evidence to support TRPA's

15  conclusion that the benefits it ascribes to the Amendments will

16  accrue.  For example, TRPA explains that the Project will bring

17  "threshold-related improvements to water quality, SEZ, soil

18  conservation, recreation, air quality, transportation and scenic

19  quality."  (Id. at 678.)

20          Even assuming the Amendments mark a change in course,

21  TRPA has provided an adequate explanation for any shift.  TRPA

22  states that it expanded the means of allocating TAUs to provide

23  incentives for a project that brings various environmental

24  benefits and will facilitate implementation of the Regional Plan.

25  It also explained that by allowing TAUs to be allocated in an

26  additional way, projects that bring environmental benefits will

27  be further incentivized because they can now receive TAUs through

28  either a ski area master plan or a community plan.  TRPA

1  therefore adequately acknowledged the "change" the Amendments
2  mark (expanding how TAUs can be allocated) and explained why it
3  was making that change.

4          For the same reasons, the court also rejects the
5  argument that TRPA's only rationale for the Amendments was to
6  "'enabl[e]' Project implementation" and that TRPA cannot justify
7  Regional Plan or Code amendments simply to accommodate a project.
8  (Pls.' Mem. at 16:1-2.)  The court acknowledges plaintiffs'
9  concern that approval of specific projects should not drive
10 broader land-use planning.  But TRPA did provide a reasonable
11 basis for adopting the Amendments and, assuming it must also give
12 an explanation as to why the Amendments will be beneficial going
13 forward, its explanation did so.[16]

14         Plaintiffs cite Western States Petroleum Ass'n v. EPA,
15 87 F.3d 280 (9th Cir. 1996), for the proposition that an agency
16 changing its course must supply a reasoned analysis for the
17 change.  There, the EPA rejected Washington's proposed permitting
18 program for emissions because it would have exempted
19 insignificant emissions units ("IEUs") from monitoring,
20 reporting, and record-keeping requirements set by EPA
21 regulations.  Id. at 283.  The court held that the EPA abused its
22 discretion because these grounds for rejection were in direct

23

24         [16]  Plaintiffs argue that defendants should have explained
   why the change in course is justified going forward with respect
25 to all projects that require additional TAUs in a ski area, why
   demonstrated need should no longer be determined through the
26 community plan process, and why ski area master plan areas should
   be singled out among all master plan areas.  This level of
27 justification is not required, however, by the Compact.  See
   Compact art. V(g) (describing standard of review as "arbitrary,
28 capricious or lacking substantial evidentiary support or whether
   the agency has failed to proceed in a manner required by law").

contradiction to its prior precedent--on eight other occasions--approving programs that omitted IEUs from those requirements. Id. at 285.  While the proposition is not mistaken, the difference between the EPA's unexplained reversal stands in stark contrast to the reasoned explanation provided by TRPA for its shift in practice.  See also Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 690 (9th Cir. 2007) (requiring reasoned analysis for departure from longstanding practice)

It is also clear that TRPA has not made a wholesale departure from any policy of community participation.  Plaintiffs argue that circumventing the community planning process "foreordained a Project that met JMA's private objectives" to construct enough residential and tourist accommodation units to generate sufficient revenues to ensure the continued viability of the ski operations.[17]  (Pls.' Reply at 10:15.)  However, defendants explain that JMA created an outreach program that TRPA concluded provided the public with an adequate means to shape the Project and determine the Project's needs.  (See AR 3918-19; TAR 744.)  While the level of community participation in preparing the ski area master plan did not have the same depth as would have been required for a community plan, it was not so scant as

---

[17]   National Parks & Conservation Ass'n v. Bureau of Land Management, 606 F.3d 1058 (9th Cir. 2010), is inapposite.  In that case, the Ninth Circuit rejected an agency's statement of purpose required for the EIS process as too narrow under the reasonableness standard because the majority of its objectives were the project proponent's and not the agency's.  Id. at 1970-71.  Likewise, Environmental Protection Information Center v. U.S. Forest Service, 234 F. App'x 440 (9th Cir. 2007), rejected the Forest Service's range of alternatives because it had defined the objectives of the project in the EIS so narrowly that only the proposed project would serve those objectives.  Id. at 443-44.

1  to be deemed nonexistent or to substantiate claims that TRPA

2  completely reversed its policy course.[18]

3           Finally, plaintiffs' arguments are misguided to the

4  extent that they imply that TRPA should not have amended the

5  Regional Plan and Code to allow the ski area master plans to be

6  used for some of the same purposes as community plans because the

7  latter are a better method of meeting those purposes.  It is the

8  responsbility of TRPA to balance benefits and harms and make the

9  policy choice it believes to be best.  Cf. Redding Rancheria,

10 2012 WL 525484, at *13 ("But of course the Tribe is not the one

11 who determines whether the Regulations were a necessary or

12 advisable means of implementing the ambiguous Restored Lands

13 Exception. Neither is this Court. . . . Congress entrusted that

14 determination to Interior.").  TRPA provided a reasonable

15 explanation for the Amendments; this is all the Compact requires.

16 Accordingly, the court finds that TRPA's adoption of amendments

17 to the Regional Plan, Code, and PASs to allow for allocation of

18 TAUs through the ski area master plan process did not violate the

19 Compact.

20

21  [18]    Plaintiffs also argue that the ski area master plan
process precluded the assessment and development of alternatives
22  based on community needs.  It is unclear what plaintiffs mean by
"alternatives," as they state on reply that they are not here
referring to the EIR-EIS's alternative analysis.  (Pls.' Reply at
23  9:13-15.)  Plaintiffs appear to argue that the community could
not participate in the formulation of the Project's objectives
24  during the ski area master plan process in the same way they
might with community planning.  (See id. at 9:8-10:16.)  This
25  argument has little force, however, because there is no
requirement that defendants use a community plan rather than a
26  ski area master plan and therefore no requirement that the
Project's objectives be shaped by the community rather than JMA.
27  To the extent this argument is a reformulation of plaintiffs'
contention that TRPA adopted the Amendments without a rational
28  basis, the court rejects it for the reasons stated above.

1          C.    <u>Code Amendments' Consistency with the Code</u>

2               Plaintiffs also argue that the amendments to the Code

3    could not be approved because they are not consistent with the

4    Code.  <u>See</u> Code § 6.3.A(1) (requiring TRPA to find that new Code

5    amendments are "consistent with, and will not adversely affect

6    the implementation of the Regional Plan, including . . . the

7    Code").  Plaintiffs locate a discrepancy in that although the new

8    Code amendments alter several Code provisions to allow allocation

9    of TAUs through ski area master plans, Code subsection

10   33.4.A(3)(d) still requires that the "[d]istribution of units

11   within the community plan shall be pursuant to the provisions of

12   the adopted community plan and . . . [a] demonstration of need

13   for additional units is shown pursuant to Chapter 14."[19]

14   Plaintiffs argue that Chapter 14 provides a detailed process to

15   determine and respond to community needs and that because the ski

16   area master plan does not even require a showing of "demonstrated

17   need" for additional TAUs, much less implicate the Chapter 14

18   process, that the amendments are inconsistent with the Code.

19               The court declines to consider this argument, however,

20   because plaintiffs failed to raise the issue during the

21   administrative process.  It is waived.

22          D.    <u>Role of the Amendments in Land-Use Planning</u>

23               Plaintiffs argue that the Compact and Regional Plan

24   "clearly indicate that general land-use planning, including the

25   Plan, Code and PASs, must come <u>before</u> site-specific project

26

27        [19]    The Code amendments necessary to allocate TAUs are to
28   Chapters 33 (Allocation of Development) and 35 (Bonus Unit
     Incentive Program).  (AR 2791.)

27

1   approvals; planning and project approval must not happen

2   simultaneously." (Pls.' Mem. at 16:17-19.)  The court finds that

3   plaintiffs adequately, if imperfectly, raised this argument.

4   (See, e.g., AR 6186 (comment from Sierra Club).)[20]

5          In Friends of Southeast's Future v. Morrison, 153 F.3d

6   1059 (9th Cir. 1998), the Ninth Circuit held that under the

7   Forest Plan at issue, an area analysis must be conducted before a

8   project-specific EIS, rather than concurrently.  Id. at 1069.

9   There, the plan stated that "[p]roject implementation will

10  normally consist of detailed site planning and project design

11  within the project locations identified through Area Analysis."

12  Id. at 1069 (internal quotation marks omitted) (emphasis in

13  original).  It also provided that "NEPA procedures will be

14  followed and project-related environmental analysis will be

15  tiered to the appropriate Area Analysis documentation."  Id.

16  (internal quotation marks omitted) (emphasis in original).

17         Neither the Compact, Plan, or Code compel action in a

18  way that parallels the strong temporal requirements in the Forest

19  Plan.  The Compact provides that "[n]o project may be approved

20  until it is found to comply with the regional plan . . . ."

21  (Compact art. VI(b).)  Likewise, the Regional Plan explains that

22  the required planning documents, as well as the Compact, "provide

23  the basic framework for judging the merits of individual

24  projects."  (RP at I-4.)  Master plans are intended "to provide

25

26         [20]   The Sierra Club commented that "[t]he TRPA process that
    permits this overwhelming change that envelopes the PAS, the CP
27  and uses the CEP to do more than was ever previously envisioned
    is not a process that turns the Regional Plan on its head, it is
28  a calculated decision by the TRPA to do just that, without
    declaring that the action amends the Regional Plan."  AR 6816.

                                    28

1 more detailed planning to ensure that projects and activities are
2 consistent with the Goals and Policies, the [PASs] or community
3 plans, and the Code." Code § 16.0. These requirements put
4 limitations on the context in which a project is developed, but
5 they do not preclude consideration of their amendment at the same
6 time a project is being developed.

7        Nor is the ski area master plan dependent on the
8 broader planning documents in the same sense as the project
9 analysis was dependent on the area analysis in the Forest Plan.
10 The ski area master plan process is guided by those documents,
11 but they do not require any specific analysis particular to a
12 project before additional analysis for that project may commence.
13 Additionally, the Compact, Plan, and PASs were in place during
14 the Project's development and drove the ski area master plan
15 process, even though TRPA concluded that some alterations were
16 appropriate to allow the Project to go forward.  Cf. Goleta I, 52
17 Cal. 3d at 573 ("[I]t may not be appropriate . . . to disregard
18 an otherwise reasonable alternative which requires some form of
19 implementing legislation . . . .  Moreover, in some
20 circumstances, an EIR may consider alternatives requiring a
21 site-specific amendment of the general plan.  However, an EIR is
22 not ordinarily an occasion for the reconsideration or overhaul of
23 fundamental land-use policy.").  Even though some elements of the
24 Project conflicted with those provisions, that does not mean they
25 did not serve the role plaintiffs deem they should have.

26        E.   Retroactive Waiver of Noncompliance with Community
27             Planning Requirement
28             Plaintiffs argue that TRPA attempted to retroactively

29

1  excuse TRPA's failure to complete a community plan.  They contend

2  that because the requirements in place at the time the Project

3  was developed required TRPA to use the community planning process

4  to allocate additional TAUs and commercial space, TRPA had to use

5  the community planning process.  Instead of creating a community

6  plan, plaintiffs argue that defendants proceeded as though the

7  community planning requirement did not exist and then waived it

8  at the same hearing at which the Project was approved, contrary

9  to law.  Defendants, however, have asserted that plaintiffs

10  failed to exhaust this claim.  Plaintiffs provide no response and

11  the court therefore assumes that they concede the point.

12  IV.  Adequacy of the EIR-EIS's Alternatives Analysis and TRPA's

13       and the County's Related Findings

14          The Project's objectives are five-fold.  (AR 2748.)

15  They are to: (1) construct onsite residential and tourist

16  accommodation units to increase midweek skier visits at the

17  resort; (2) optimize the quality of the winter ski experience and

18  improve the year-round use of the site; (3) maintain consistency

19  with the scale and character of Homewood, California; (4) enhance

20  the lifestyle and property values of West Shore residents; and

21  (5) generate sufficient revenues to support the Project's

22  proposed environmental and fire safety improvements, as well as

23  the economic viability of the ski operations.  (Id. at 2738-39.)

24          The Draft EIR-EIS considered six alternatives designed

25  to meet some or all of these objectives.  (See id. at 268-70.)

26  The Final EIR-EIS added a seventh alternative, which is a revised

27  version of the Project, created based on public input on the

28  draft.  (Id. at 2691-92.)  Alternative 1 is the proposed project

30

1   and it proposed to redevelop the North Base area, adding new

2   mixed-use buildings and new residential units; build a lodge at

3   the Mid-Mountain Base area and other amenities like a detached

4   gondola terminal, a new learn-to-ski lift, and an outdoor

5   swimming facility; and convert the South Base area to residential

6   uses. (Id. at 2691.)  The proposed project required the

7   amendments related to TAU transfers considered in part III.A,

8   supra, as well as amendments to the Code's provisions on height

9   and grading standards and to three PASs. (Id.)   Alternative 1A

10  is the revised proposed project. (Id. at 2691-92.)  This

11  alternative replaced two of the three large multi-family

12  residential condo buildings at the South Base area with twenty-

13  four smaller chalet buildings, reducing the total number of

14  multi-family residential units from 99 in Alternative 1 to 95 in

15  Alternative 1A. (Id. at 2692.)

16          Alternative 2 is no project and Alternative 3 is

17  similar to the proposed project, but required no Code amendment

18  to building height. (Id.)  Alternative 4 proposed to close the

19  ski resort and put in estate residential lots and one commercial

20  lot; it required an amendment to a PAS. (Id.)  Alternative 5

21  reduced the size of the Project area, but still required

22  amendments to the Code (regarding height) and the PASs, although

23  it did not require an amendment to change PAS boundaries and

24  thereby expand the urban boundary of the project. (Id. at 2692-

25  2693.)  Alternative 6 is the reduced-size alternative, which

26  proposed to reduce the number of total tourist accommodation and

27  residential units by approximately fifteen percent (from 336 to

28  284 tourist accommodation and residential units). (Id. at 2693,

2750-51.)

A.   Adequacy of the EIR-EIS's Alternatives Analysis Under
CEQA

CEQA recognizes that "it is the policy of the state
that public agencies should not approve projects as proposed if
there are feasible alternatives or feasible mitigation measures
available which would substantially lessen the significant
environmental effects of such projects."  Cal. Pub. Res. Code §
21002.  To implement this policy, CEQA requires the consideration
and analysis of project alternatives that would reduce adverse
environmental impacts.  Mount Shasta Bioregional Ecology Ctr. v.
Cnty. of Siskiyou, 210 Cal. App. 4th 184, 197 (3d Dist. 2012); In
re Bay-Delta Programmatic Envtl. Impact Report Coordinated
Proceedings, 43 Cal. 4th 1143, 1163 (2008) ("In re Bay-Delta").
The court reviews the EIR-EIS's selection of alternatives and its
analysis of those alternatives to determine if they comply with
CEQA's procedural mandates and then decides whether substantial
evidence supports the decisions made.  Cal. Native Plant Soc.,
177 Cal. App. 4th at 988.

1.   No-Amendment Alternative

Plaintiffs first contend that the EIR-EIS failed to
consider a reasonable range of alternatives because it did not
consider any alternative that required no amendments to the
Regional Plan, Code, or PASs.[21]  Requests for analysis of such an

---

[21]   Plaintiffs clarify in their reply that they are not
arguing that the alternatives in the EIR-EIS improperly focused
on meeting JMA's objectives and that therefore the range of
alternatives analyzed in the EIR-EIS was improperly narrow.
(Pls.' Reply at 27:8-10.)  The court therefore does not address
defendants' arguments as they apply to this point.  (See Defs.'

alternative were made during the scoping process.  (See AR 2752-55.)  Plaintiffs argue that the EIR-EIS did not provide a reasonable basis for omitting a no-amendment alternative because it only explained that "[t]here is no legal requirement that an alternative be considered" that requires no amendments.  (Id. at 3923.)  Second, they argue that defendants have adopted a litigation position that the EIR-EIS properly rejected a no-amendment alternative because it would not allow for overnight lodging, contrary to the Project's objectives, which is not supported by the record.

"Generally, an agency's selections of alternatives will be upheld as long as there is a reasonable basis for the choice it has made."  City of Maywood v. L.A. Unified Sch. Dist., 208 Cal. App. 4th 362, 416 (2d Dist. 2012).  Clearly, the EIR-EIS's explanation that it is not legally required to consider a certain alternative would be inadequate standing alone because no particular alternative is legally required; the rule of reason controls the selection of alternatives.  See Citizens of Goleta Valley v. Bd. of Supervisors, 197 Cal. App. 3d 1167, 1177 (2d Dist. 1988) ("Goleta II").  However, the EIR-EIS also explains that "[a]n alternative that eliminates overnight lodging would be inconsistent with HMR's objective to transform Homewood into an overnight destination."  (AR 3923.)  Although plaintiffs protest that this explanation is not explicitly linked to a no-amendment alternative, defendants assert that it applies because the no-amendment alternative is an alternative that does not provide

Mem. in Supp. of Summ. J. ("Defs.' Mem.") at 29-32 (Docket No. 47-1).)

33

overnight lodging.   The connection between the no-amendment

alternative and overnight lodging explanation could have been

clearer, but this explanation would have sufficed, if it were

certain that a no-amendment alternative could not provide

overnight lodging.   Cf. City of Maywood, 208 Cal. App. 4th at

416-18 (finding explanation that proposed reduced-sized

alternative would not comply with regulations regarding student

density for high schools to be a reasonable basis for not

including the alternative in the EIR).

At oral argument, the parties continued to dispute

whether the no-amendment alternative could provide overnight

lodging.   The record shows that without any amendments to the

PASs, the Project's residential and tourist accommodation units

would be placed largely in PAS 157.   (See AR 2790.)   Although the

allowable uses in PAS 157 include bed and breakfast tourist

accommodations and hotel, motel, and other transient tourist

accommodation units, (id. at 2962-63), developing those uses

would require the transfer of TAUs into PAS 157, (id. at 2988-

89).   However, because PAS 157 is not designated as a "receiving

area," such tourist lodging could not be built without an

amendment to PAS 157 to make it eligible to receive TAUs from

other areas.   (Id.)   Plaintiffs focus on PAS 159, which is such a

receiving area.   (Id. at 19051.)   But only a very slim portion of

the Project area is within PAS 159.

Defendants do not contest, however, that single-family

residential units could be built in PAS 157 without amendment.

The Project's objective pertaining to overnight accommodations is

to "construct[] . . . onsite residential and tourist

34

accommodation units." (Id. at 2738.)  A no-amendment alternative
would arguably meet this objective by providing residential
units.  More importantly, even if the no-amendment alternative
did not meet all of the Project's objectives, that alone is an
insufficient reason to reject it.  See In re Bay-Delta, 43 Cal.
4th at 1165 (explaining that "an EIR should not exclude an
alternative from detailed consideration merely because it 'would
impede to some degree the attainment of the project objectives'"
unless it is otherwise infeasible or the lead agency has
determined that it cannot meet the project's underlying
fundamental purpose (quoting Guidelines § 1516.6(b)));
Watsonville Pilots Ass'n v. City of Watsonville, 183 Cal. App.
4th 1059, 1088 (6th Dist. 2010) (rejecting claim that reduced
development alternative did not require analysis in EIR simply
because it could not satisfy every objective for the city's new
general plan).[22]  Thus, defendants have failed to articulate a
reasonable basis for not evaluating a no-amendment alternative.

Although the EIR-EIS did not provide an explanation for
its exclusion of a no-amendment alternative, CEQA requires only
that an EIR analyze "those alternatives necessary to permit a
reasoned choice."  Goleta II, 197 Cal. App. 3d at 1177-78.  There

---

[22]    In their briefs, defendants construe the analysis in
the EIR-EIS that a no-amendment project would not meet one of the
project's objectives as a finding that such an alternative would
not meet the fundamental purpose of the project.  (Defs.' Mem.
36:7-9.)  An alternative that does not meet a project's
fundamental purpose need not be considered.  In re Bay-Delta, 43
Cal. 4th at 1165.  If it were the case that the no-amendment
alternative fails to meet the Project's fundamental purpose by
providing only residential accommodations and that the EIR-EIS
rejected it for that reason, the court's conclusion that the EIR-
EIS did not need to consider a no-amendment alternative would
only be strengthened.

1  is "no categorical legal imperative as to the scope of

2  alternatives to be analyzed in an EIR.  Each case must be

3  evaluated on its facts, which in turn must be reviewed in light

4  of the statutory purpose."  Goleta I, 52 Cal. 3d at 566; see also

5  Mira Mar Mobile Cmty. v. City of Oceanside, 119 Cal. App. 4th

6  477, 487 (4th Dist. 2004) ("Mira Mar") ("The discussion of

7  alternatives is subject to a rule of reason . . . .").

8         The alternatives analysis must at least "describe a

9  range of reasonable alternatives to the project . . . which would

10  feasibly attain most of the basic objectives of the project but

11  would avoid or substantially lessen any of the significant

12  effects of the project . . . ."  Guidelines § 15126.6(a); see

13  also Goleta I, 52 Cal. 3d at 566 (requiring range of alternatives

14  that offer substantial environmental advantages and are

15  feasible).  "Absolute perfection" is not required of the agency's

16  selection of alternatives; rather, the "key issue is whether the

17  alternatives discussion encourages informed decision-making and

18  public participation."  Cal. Oak Found. v. Regents of Univ. of

19  Cal., 188 Cal. App. 4th 227, 276 (2010).  The party disputing the

20  adequacy of the agency's chosen alternatives must demonstrate

21  that "the agency failed to satisfy its burden of identifying and

22  analyzing one or more potentially feasible alternatives. . . .

23  [It] may not simply claim the agency failed to present an

24  adequate range of alternatives and then sit back and force the

25  agency to prove it wrong."  Mount Shasta Bioregional Ecology

26  Ctr., 210 Cal. App. 4th at 199.

27         The EIR-EIS analyzed seven alternatives.  No

28  alternative, except for Alternative 2 (no project) was a no-

36

amendment alternative.   Alternative 4 required only one

modification to a PAS, but it is also closed the ski resort.

Plaintiffs contend that a no-amendment alternative would have

allowed for consideration of a project that could avoid

significant impacts by preserving the environmental protections

the Regional Plan, Code, and PASs provide and also meet most of

the developer's objectives.   Defendants argue that the EIR-EIS

considered a reasonable range of alternatives, that a no-

amendment alternative would merely fall within the range of those

already analyzed in the EIR-EIS, and that the EIR-EIS did not

need to analyze another alternative that did not meet the

Project's primary purpose.[23]

          To show that the range of alternatives examined in the

EIR-EIS was unreasonable, plaintiffs analyze each selected

alternative and conclude that only Alternative 6 is a potentially

viable alternative to the Project.   (See Pls.' Reply at 15-17.)

Plaintiffs note that the alternatives identified by defendants as

focusing on what the Project would look like without amending the

Code, Alternatives 3 and 5, actually require extensive amendments

(thereby still allowing significant land-use changes) and did not

offer any environmental advantages over the Project.   (Id.)

Plaintiffs scrutinize Alternatives 2 and 4, which required,

respectively, no amendments or one amendment to a PAS, as failing

to meet the Project's objectives.   (Id. at 17.)

          "[A]lternatives need not satisfy all project

----

          [23]   Because the court rejects defendants' contention that a
no-amendment alternative could not meet the objective of
providing overnight residential and tourist accommodation units,
it finds the argument misdirected here as well.

1   objectives, they must merely meet 'most' of them." <u>Mira Mar</u>, 119

2   Cal. App. 4th at 489 (2004).  Plaintiffs are correct that

3   Alternative 4's proposal to build estate homes did not meet most

4   of the Project's objectives and therefore does not contribute to

5   a reasonable range of alternatives.  However, Alternative 2, the

6   no-project alternative, does contribute to such a range.  <u>Cf.</u>

7   <u>Mount Shasta Bioregional Ecology Ctr.</u>, 210 Cal. App. 4th at 199

8   (EIR-EIS that analyzed only no project alternative and proposed

9   project considered reasonable range of alternatives).  And

10  although alternatives that have the same or worse environmental

11  impacts as the proposed project do not further CEQA's purposes,

12  they may be helpful in identifying which features of the proposed

13  project are more or less environmentally friendly.  <u>Cf. id.</u> at

14  490 (explaining that alternatives that have comparable or worse

15  impacts to the proposed project do not further CEQA's purposes

16  and declining to condone their inclusion in the EIR).  Despite

17  the flaws with Alternatives 3 and 5, the EIR-EIS still analyzed

18  two alternatives that reduced the environmental impacts of the

19  project: the no-project alternative and a reduced-size

20  alternative.

21          The range of alternatives considered by the EIR-EIS is

22  reasonable.  The EIR-EIS compared and contrasted six alternatives

23  (besides the proposed project).  With this range, the public and

24  decision makers could compare the environmental impacts of

25  closing the Resort, reducing the size of the proposed project,

26  and adjusting the proposed project in different ways with the

27  proposed project's environmental impacts.  This array of

28  alternatives "represent[s] enough of a variation to allow

38

1 informed decision making." Id. at 412 (internal quotation marks

2 omitted).  And "if an EIR discusses a reasonable range of

3 alternatives, it is not rendered deficient merely because it

4 excludes other potential alternatives."  Id.

5        This range is not legally deficient because it also did

6 not address a no-amendment alternative.  Whether the EIR-EIS

7 might have considered a no-amendment alternative depends on

8 whether that alternative "would have been 'capable of avoiding or

9 substantially lessening any significant effects of the

10 project,' even if it 'would impede to some degree the attainment

11 of the project objectives.'"  Watsonville Pilots Ass'n, 183 Cal.

12 App. 4th at 1087 (quoting Guidelines § 15126.6(b)).  Plaintiffs

13 argue that the no-amendment alternative would have "preserved

14 existing land-use rules" and thereby "avoided impacts by

15 preserving the environmental protections inherent in those

16 rules." (Pls.' Reply at 14:18-19.)  The court agrees with

17 plaintiffs that defendants cannot dispute that removing the

18 physical restrictions imposed by those rules would create effects

19 on the physical environment.  Indeed, defendants noted that if

20 they had not built the Code amendments into the Project, a

21 significant effect would have resulted.  (AR 3926); see also

22 Citizens Ass'n for Sensible Dev. of Bishop Area v. Cnty. of Inyo,

23 172 Cal. App. 3d 151, 175 (4th Dist. 1985) ("It is true that a

24 project would normally be considered to have a significant effect

25 on the environment if it conflicts with the adopted environmental

26 plans and goals of the community where it is located.").

27        Under CEQA, however, a court cannot require an agency

28 to consider an alternative merely because plaintiffs can show

39

1   that it is environmentally superior in certain aspects.  Instead,

2   the alternative must avoid or substantially limit a significant

3   and unavoidable effect of the project.  After mitigation, the

4   Project's impacts are reduced to a less than significant level

5   with four exceptions.  These include impacts on traffic at two

6   already congested locales and significant climate change impacts.

7   (See AR 2705, 2708, 2726; see also id. at 8961-62 (third-party

8   appeal to EIR-EIS certification).)  Thus, plaintiffs' argument

9   that a no-amendment alternative should be considered because it

10  preserves existing land-use rules fails because the Project has

11  no significant and unavoidable effects related to land-use

12  regulations.

13          A no-amendment alternative would necessarily be smaller

14  than the Proposed project because only residential units could be

15  built.  But because any reduced-size project would still create

16  additional traffic and generate greenhouse emissions, TRPA

17  explained that the Project's unavoidable impacts are likely to

18  remain substantial and unavoidable with any smaller

19  alternative.[24]  (See id. at 8961 ("Any alternative that would

20  result in an incremental increase in traffic at Fanny Bridge

21  would also result in significant and unavoidable impacts . . .

22  ."), 8962 ("Any alternative that attains the basic objective of

23  the Project, however, would also result in significant and

24  ───────────────

25      [24]    The court may consider the whole record in determining
    whether the range of alternatives is reasonable.  See Cal. Native
26  Plant Soc., 177 Cal. App. 4th at 987 (holding that where
    complaint regarding alternatives analysis was that it was "merely
27  perfunctory," court could review the whole record to assess the
    sufficiency of the range of alternatives in the EIR).

28

1  unavoidable impacts with respect to cumulative climate

2  change.").)  Substantial evidence supports the conclusion that

3  the no-amendment alternative would not avoid or substantially

4  reduce the Project's unavoidable impacts.  The court thus finds

5  that the EIR-EIS's alternatives analysis is not inadequate

6  because it did not consider a no-amendment alternative.

7                2.   Additional Reduced-Size Alternative

8              As explained above, the range of alternatives

9  considered in the EIR-EIS was reasonable.  "When an EIR discusses

10  a reasonable range of alternatives sufficient to foster informed

11  decisionmaking, it is not required to discuss additional

12  alternatives substantially similar to those discussed." Cherry

13  Valley Pass Acres & Neighbors v. City of Beaumont, 190 Cal. App.

14  4th 316, 355 (4th Dist. 2010).  An EIR's selection of

15  alternatives should not become vulnerable when decision makers

16  and the public can intelligently consider an alternative not

17  discussed in the EIR by studying the alternatives that are.  See

18  Vill. Laguna of Laguna Beach, Inc. v. Bd. of Supervisors, 134

19  Cal. App. 3d 1022, 1028 (4th Dist. 1982) (declining to hold that

20  the agency should have considered another alternative between

21  10,000 and 20,000 units when the EIR evaluated plans for the

22  development of 0, 7,500, 10,000, 20,000, and 25,000 dwelling

23  units); cf. Watsonville Pilots Ass'n, 183 Cal. App. 4th at 1090

24  (requiring consideration of reduced alternative when the only

25  comparable alternative was the no-project alternative, which did

26  not serve the purpose that a reduced-development alternative

27  should have served).

28             The EIR-EIS already considered one reduced-size

41

alternative, Alternative 6.  The environmental advantages of an even smaller alternative could be understood from the EIR-EIS's analysis of that alternative as impacts, such as the amount of emissions the alternative would produce, would be proportionally reduced.  But plaintiffs also contend that the record indicates that the impacts of another reduced-size alternative could have been substantially less.  As the court noted in its discussion of the no-amendment alternative, TRPA explained that any reduced variation of the Project would have the same unavoidable effects as the Project, although on an incrementally smaller scale.  See Mira Mar, 119 Cal. App. 4th at 491 (declining to require city to consider additional alternative for planned 96-unit condominium development when it would encounter the same environmental problems as those already analyzed).  Plaintiffs have proffered no countervailing evidence that a reduced project, such their suggestion of one with a one-third reduction in units, would substantially reduce the Project's traffic and climate change impacts.  Cf. Mount Shasta Bioregional Ecology Ctr., 210 Cal. App. 4th at 199 ("[P]laintiffs make no attempt to show how such alternative . . . would have reduced overall environmental impacts of the Project."); Tracy First, 177 Cal. App. 4th at 929 (noting that for project with significant air quality and traffic impacts, where there was no evidence in the record that fewer customers would patronize a smaller store, whether the smaller alternative would have less significant effects, and to what degree, was only speculation).

        "CEQA does not require an EIR to consider 'each and every conceivable variation of the alternatives stated.'"  Mira

42

1  Mar, 119 Cal. App. 4th at 491 (quoting Residents Ad Hoc Stadium

2  Com. v. Bd. of Trustees, 89 Cal. App. 3d 274, 287 (1979)).

3  Consideration of one reduced-size alternative, in conjunction

4  with the Project's other alternatives, "represent[ed] enough of a

5  variation to allow informed decisionmaking."   Mann, 233 Cal. App.

6  at 1151.   Although the court recognizes that a smaller

7  alternative was possibly not considered on the grounds of

8  economic infeasibility, which it has found unsubstantiated,

9  plaintiffs identify no cases, and the court finds none, that

10  demand an additional reduced-size alternative to be considered

11  when the range of alternatives is otherwise reasonable.

12  Accordingly, the court finds that the EIR-EIS is not inadequate

13  for declining to study an additional reduced-size alternative.

14       B.   Economic Infeasibility

15            1.   TRPA's and the County's Findings of Financial

16                 Infeasibility under CEQA

17            Before an agency "may approve a project with a

18  significant environmental impact, it is required to make findings

19  identifying . . . the [s]pecific . . . considerations that make

20  infeasible the environmentally superior alternatives . . . ."

21  Flanders Found. v. City of Carmel-by-the-Sea, 202 Cal. App. 4th

22  603, 620-21 (6th Dist. 2012) (alterations in original) (internal

23  quotation marks omitted).   The Guidelines define "feasible" as

24  "capable of being accomplished in a successful manner within a

25  reasonable period of time, taking into account economic,

26  environmental, social, and technological factors."   Cal. Pub.

27  Res. Code § 21061.1; see also Guidelines § 15126.6(f)(1) (stating

28  that the "economic viability" of an alternative is a relevant

43

consideration when evaluating the feasibility of an alternative).
As to a project's economic feasibility, "'[t]he fact that an
alternative may be more expensive or less profitable is not
sufficient to show that the alternative is financially
infeasible.  What is required is evidence that the additional
costs or lost profitability are sufficiently severe as to render
it impractical to proceed with the project.'"  <u>Pres. Action
Council v. City of San Jose</u>, 141 Cal. App. 4th 1336, 1352 (2006)
(quoting <u>Goleta II</u>, 197 Cal. App. 3d at 1181).

       The agency's feasibility findings must be "based on
substantial evidence set forth anywhere 'in the record.'"  <u>Goleta
I</u>, 52 Cal. 3d 553 at 569 (quoting Cal. Pub. Res. Code § 21081.5);
<u>see also</u> Guidelines § 15131(c).[25]  Substantial evidence is not
"[a]rgument, speculation, unsubstantiated opinion or narrative,
evidence which is clearly erroneous or inaccurate . . . ."  <u>Id.</u> §
15384.  Although the agency may rely on expert opinion, it must
be supported by facts.  <u>Id.</u>; <u>see</u> <u>Bakersfield Citizens for Local
Control v. City of Bakersfield</u>, 124 Cal. App. 4th 1184, 1198 (5th
Dist. 2004).  The agency cannot simply rely on evidence proffered
by the project's proponent regarding infeasibility; instead, the
agency "'must <u>independently</u> participate, review, analyze and

---

[25]   The Guidelines provide:

   [E]conomic, social, and particularly housing factors shall
   be   considered   by   public   agencies   together   with
   technological   and   environmental   factors   in   deciding
   whether changes in a project are feasible to reduce or
   avoid   the   significant   effects   on   the   environment
   identified in the EIR. If information on these factors is
   not contained in the EIR, the information must be added to
   the record in some other manner . . . .

Guidelines § 15131(c).

1    discuss the alternatives in good faith.'"   <u>Save Round Valley</u>
2    <u>Alliance v. Cnty. of Inyo</u>, 157 Cal. App. 4th 1437, 1460 (4th
3    Dist. 2007)   (quoting <u>Kings Cnty. Farm Bureau v. City of Hanford</u>,
4    221 Cal. App. 3d 692, 708 (5th Dist. 1990)) (emphasis in
5    original).

6           Although a reviewing court should not decide whether
7    studies are irrefutable or could have been better, it cannot
8    "'uncritically rely on every study or analysis presented by a
9    project proponent in support of its position.  A clearly
10   inadequate or unsupported study is entitled to no judicial
11   deference.'"   <u>Berkeley Keep Jets Over the Bay Comm. v. Bd. of</u>
12   <u>Port Comm'rs</u>, 91 Cal. App. 4th 1344, 1355 (2001) ("<u>Berkeley</u>")
13   (quoting <u>Laurel Heights</u>, 47 Cal.3d at 409).  However,
14   "[t]echnical perfection is not required; [the court] looks not
15   for an exhaustive analysis but for adequacy, completeness, and a
16   good-faith effort at full disclosure."   <u>Eureka Citizens for</u>
17   <u>Responsible Gov't v. City of Eureka</u>, 147 Cal. App. 4th 357,
18   371-72 (1st Dist. 2007).  Here, TRPA and the County did not just
19   rely on the financial documentation submitted by JMA to reach the
20   determination that Alternative 6 or any other reduced alternative
21   is financially infeasible.[26]  They also considered economic
22   analyses prepared by an independent third-party expert, BAE Urban
23   Economics.  BAE prepared an initial memorandum and, later, a
24   follow-up memorandum after FOWS submitted a letter commenting on

25

26   _____

27        [26]   JMA submitted a "Homewood Sustainability Analysis,"
     which stated that a twenty percent reduction in unit count would
28   not be sufficient to justify investment in the Project.  (AR
     40112-13.)

1 the initial analysis.[27]  (AR 18968.)

2          BAE's initial memorandum considered the prospect of the

3 ski operations achieving profitability over the long term with

4 Alternative 6 (the "reduced project"), having 284 units (the

5 proposed project has 336 units).  (Id. at 40477.)  It explained

6 that the resort is currently operating at a loss and needs to

7 invest about $10 million in capital improvements to two of its

8 main ski lifts in the near future.  (Id. at 40478.)  BAE states

9 that Homewood's mid-week skier average is significantly lower

10 than the industry average.  (Id.)  This is because the resort has

11 no overnight accommodations, it is primarily considered a "day

12 ski" area.  (Id.)  BAE states that Homewood's owners have

13 designed the Project to increase revenues, and thus better cover

14 the costs of operating the resort, by increasing the number of

15 mid-week, non-holiday skiers.  (Id. at 40479.)  While the

16 proposed project would potentially bring $823,284 per year in

17 increased skier revenue, this profit is projected to decrease by

18 $127,609 per year if the reduced project is implemented.[28]  (Id.

19 at 40483.)  BAE later adjusted its estimate of the proposed

20

21          [27]    The court declines to speculate as to the implications
22 of the timing of TRPA and the County's receipt of Homewood's
   economic sustainability analysis and the BAE reports.  There is
23 "nothing in CEQA requiring an EIR to analyze issues of economic
   feasibility or requiring an agency to receive public input on the
24 question of economic feasibility."  Sierra Club v. Cnty. of Napa,
   121 Cal. App. 4th 1490, 1506 (1st Dist. 2004)  The court's review
25 is limited to whether there is substantial evidence in the record
   to support TRPA and the County's economic feasibility findings.

26
          [28]    It calculated the estimated revenue increase based on
27 the assumption that the accommodation units would average a
   fifty-five percent occupancy rate of 2.25 skiers and that
28 Homewood would cap attendance on eight peak days.  (Id. at
   40481.)

project's skier revenues to be approximately $670,000. (See id. at 18971.)

The "analysis does not estimate the potential revenue gains from other related operations, such as ski rental, ski lessons, and resort dining facilities" because, "to the extent that these operations also represent an opportunity for the ski resort to increase its profitability, the reduction in potential skier days associated with the reduced project alternative would have a commensurate reduction in the potential revenue support that these operations could provide . . . ." (Id. at 40481.) It thus finds that "[a]ny reduction in resort lodging units from the [Project] will reduce the potential skier revenues and impair the resort's ability to achieve ongoing operational viability." (Id. at 40485.)

The analysis further explains, however, that even for the proposed project, increased skier visits alone will not be sufficient to generate a gross operating profit and justify the additional required major capital investments. (Id.) Thus, "it will be necessary for the ski resort to generate additional profits from other aspects of the project . . . including ski rental, lessons, and food service operations." (Id.) Each "income stream[] will be necessary to support resort viability and the reduced project alternative would only erode this ability." (Id.) Moreover, any version of the project will likely need to invest profits from the associated real estate development into supporting the ski resort's immediate capital investment needs. (Id.) BAE reports that the increase in skier revenues under the proposed project would attract $5.5 million in

47

1  new capital investments and $4.6 million under the reduced

2  project.  (Id. at 40483.)

3        The second memorandum from BAE explains that "lift

4  ticket sales represent 52 percent of total operating revenue" for

5  resorts of Homewood's size.  (Id. at 18968-69.)  It rejects the

6  suggestion "that a mechanism might be created whereby the

7  adjacent real estate would provide an ongoing operating subsidy

8  to the ski resort."  (Id. at 18969.)  Revenues from the real

9  estate development are intended "to provide [a] cross-

10 subsidization of the resort's one-time capital needs" and "once

11 the real estate development is complete, there will not be a

12 mechanism or source for ongoing subsidies from real estate

13 development."  (Id.)  Moreover, such a mechanism is "not likely,

14 because the project has not yet identified the full costs of

15 required mitigations and/or exactions that could be imposed by

16 regulating agencies."  (Id.)  BAE opines that it will likely be a

17 challenge to meet the resort's capital needs with revenues from

18 the real estate, let alone provide an ongoing subsidy for the ski

19 resort.  (Id.)

20        As to the potential for other departments at the Resort

21 to generate additional revenue, BAE's second memoranda elaborates

22 that although they create additional revenue, they also generate

23 additional offsetting costs.  (Id. at 18970.)  Ultimately, BAE

24 opined that:

25        [T]he proposed project's bed base, less reductions in
          ticket revenues from capping peak day attendance, plus
26        any minor increases in profits from other departments are
          designed to achieve profitability that will enable the
27        resort to be sustainable over time.  The reduced project
          alternative or (other smaller alternatives) would
28        undermine this and would not likely generate sufficient

                               48

additional operating revenues to address the operating losses.

(Id. at 18971.)

The BAE memoranda fail to provide substantial evidence that Alternative 6 is economically infeasible.  At best, BAE's analyses show that a reduced-size alternative would be less profitable.  Fatal to BAE's flawed conclusion of infeasibility is its failure to consider the Resort's other revenue streams besides lift tickets, to what extent the real estate component of the project could support the reduced project's economic feasibility, and whether the capital investment a reduced project could attract is sufficient.

First, the memoranda fail to provide a factual basis for the conclusion that the reduction in profits from ticket sales in the reduced project is so severe as to render "it impractical to proceed with the project."  Pres. Action Council, 141 Cal. App. 4th at 1352.  Although revenues from various other departments are cited as critical to the financial viability of the proposed project and comprise forty-eight percent of the resort's revenues, they are not given the same importance in the memoranda's review of Alternative 6.  Indeed, BAE's analyses show that even the proposed project cannot make up the deficit at which it is currently operating on profits from additional lift tickets alone.  BAE estimates the revenues from the proposed project's increased sale of lift tickets to be $670,000 per year; thus, the proposed project's other operations must produce at least $330,000 in profits just to prevent the Resort from losing money each year.  BAE appears to assume that with the proposed

1  project, the Resort's other operations can make up the deficit

2  from increased lift ticket sales to ensure long-term

3  profitability of the resort, but does not show that the reduced

4  project cannot also do so.

5        The only explanation given for the different treatment

6  of these revenues streams in BAE's analyses of the feasibility of

7  the proposed project and the reduced project is that the latter's

8  reduced ticket sales will result in less revenue from those other

9  departments because fewer skiers will use the Resort's services

10 and those departments carry offsetting costs.[29]  But this

11 distinction only shows lower profitability; it does not rise,

12 without more, to a showing of infeasibility.  BAE makes no

13 attempt to estimate the potential revenue the Resort's other

14 operations could provide under Alternative 6 or the proposed

15 project and thus fails to provide evidence in this regard for its

16 conclusion that Alternative 6 is economically infeasible while

17 the proposed project is feasible.

18       Next, BAE asserts that revenue from sales of

19 residential/lodging units is "necessary to support resort

20 viability," but also that "the reduced project alternative would

21 only erode this ability."  (Id. at 40485.)  If real estate income

22 is necessary to the long-term economic feasibility of the

23 proposed project because it helps to meet immediate capital

24 needs, it is also necessary to the reduced alternative's

25 feasibility, even if the income from it is proportionally less.

26

27       [29]  Indeed, BAE's further explanation that marginal revenue
   increases in the other departments will also bring marginal
28 increases in costs, undermines the profitability of both the
   proposed project and the reduced alternative.

1   But BAE's analyses do not take the next step and show that the

2   reduced project's reduction in profit is too much.  Indeed, BAE's

3   conclusion from this portion of its analysis begs the question:

4   Is the lesser income from the reduced project's real estate sales

5   insufficient to support the Resort's long-term feasibility?

6          The memoranda also fail to consider whether the real

7   estate component could provide an ongoing subsidy for the resort,

8   explaining that it is intended only to provide a one-time subsidy

9   for the resort's capital costs and that mitigation costs are

10  unknown.  (Id. at 18969.)  Despite JMA's intention that the real

11  estate component only provide a one-time surge of capital, BAE

12  explains that a mechanism to create an operating subsidy from

13  that component "might be created," but this is not likely because

14  of the unknown mitigation costs.  However, the record shows that

15  mitigation costs are fixed at $20-25 million, even if the units

16  are reduced.  (Id. at 9376.)  Because BAE did not estimate the

17  possible revenue from any such subsidy, another potential source

18  of support for the economic feasibility of the reduced project

19  went unconsidered.

20         Finally, BAE concluded that a smaller alternative's

21  reduced profitability would decrease its ability to attract

22  investment capital, which in turn would increase Homewood's

23  difficulty in financing the necessary capital improvements.  Even

24  the proposed project, however, will not attract enough capital

25  financing to completely fund the improvements.  (Id. at 40478,

26  40483.)  Furthermore, although BAE acknowledges that the

27  developer can invest profits from the project's real estate

28  development into supporting the ski resort's immediate capital

1  investment needs, it does not idicate whether the sales from the

2  reduced project's real estate component could make up the

3  difference between the investment it would attract and the

4  Resort's capital needs.  Again, even though the reduced

5  alternative will bring in less capital, BAE provides no facts to

6  show that the lesser amount is not enough.

7          These flaws are exacerbated by the lack of relevant

8  financial data.  Except for listing what appears to be the

9  average revenue for departments, excluding lift ticket sales, at

10 ski resorts similar to Homewood in size, (id. at 18970), BAE

11 never estimates the projected revenues for such departments at

12 Homewood for either the proposed project or its reduced

13 variation.  Nor does it provide any data on the potential income

14 from the real estate component of the project.  In Center for

15 Biological Diversity v. County of San Bernardino, 185 Cal. App.

16 4th 866 (2010), the EIR relied exclusively on a memorandum from

17 an environmental consulting firm to establish the financial

18 infeasibility of an enclosed composting facility as an

19 alternative to an open-air facility.  Id. at 876.  The memorandum

20 based its estimate of costs for the proposed private composting

21 facility only on the costs associated with the development of one

22 public enclosed facility, even though there were other entities

23 operating within the state, as well as nationally, which

24 suggested that enclosed facilities might be economically

25 feasible.  Id. at 884.

26          The court in that case noted various omissions in the

27 report, including its assumptions that the costs of that one

28 facility were reasonable and illustrative of the general costs of

52

composting facilities, as well its failure to explain why the

costs of the public project more than doubled from the initial

estimate or why the project took longer to develop than

anticipated.  Id.  Overall, the court found that the memorandum

lacked "meaningful comparative data pertaining to a range of

economic issues."  Id.  It court held that substantial evidence

did not support the final EIR's position that an enclosed

facility was infeasible.  Id. at 885.[15]

        This court does not question BAE's expertise or dispute

the accuracy of the information it did rely on, but notes, like

_____

[15]   Defendants cite several cases for the proposition that
courts have upheld agencies' findings on the economic
infeasibility of alternatives.  See, e.g., Flanders Found., 202
Cal. App. 4th at 619-623; Cherry Valley Pass Acres & Neighbors,
190 Cal. App. 4th at 353-55; San Franciscans Upholding the
Downtown Plan v. City & Cnty. of S.F., 102 Cal. App. 4th 656,
693-95 (1st Dist. 2002); City of Fremont v. S.F. Bay Area Rapid
Transit Dist., 34 Cal. App. 4th 1780, 1787-89 (1st Dist. 1995).
The court does not dispute this proposition.  More importantly,
in none of these cases did the evidence of financial feasibility
suffer from the same conclusory analysis or lack of key economic
data as in the present case.  In Flanders Foundation, plaintiffs
critiqued an expert's report finding an alternative to restore
and lease a City-owned property to be infeasible on the grounds
that it: "d[id] not look at comparable park/mansion properties,
City maintenance expenses, City budget and funding capabilities,
nor the financial feasibility of any of the myriad potential
quasi-public uses suggested by the Flanders Foundation and
others."  202 Cal. App. 4th at 621.  However, there was an
explanation for each of these omissions.  The report's author
looked for, but could not find, any comparable properties; the
City would have to restore the property to lease it at a cost
exceeding $1 million and therefore it could have reasonably
concluded that spending any amount of maintenance expenses on the
property was inappropriate; the City's budget and funding
capabilities were not relevant because the feasibility
determination depends on whether a reasonably prudent property
owner would proceed with the alternative (such a person would not
when there was significant benefit to restoring and selling the
property); and there was no viable lease market for any "quasi-
public" use.  Id. at 621-22.  In contrast, there is no
explanation for the omissions in BAE's memoranda identified
above, especially because BAE itself has stressed the importance
to the proposed project of revenue streams besides lift tickets.

1  the court in Center for Biological Diversity, that significant

2  gaps in BAE's memoranda information render meaningful comparison

3  between the proposed project and the reduced alternative

4  impossible.  As explained above, while the information provided

5  by JMA and BAE includes the projected profits from increased lift

6  ticket sales, the BAE memoranda are bereft of projections of the

7  profits that the Resort's other departments will contribute under

8  either version of the project, although they do estimate the

9  potential capital investment each would attract.  Without such

10 comparative data, the economic feasability of the reduced

11 alternative is unknown beyond the obvious conclusion that it

12 would be less profitable.  See Uphold Our Heritage v. Town of

13 Woodside, 147 Cal. App. 4th 587, 599 (2007) (finding conclusion

14 that alternatives were financially infeasible was not supported

15 by substantial evidence when EIR included cost of the proposed

16 alternatives, which would restore the home, but not the cost of

17 the proposed project, which would build a new home); Goleta II,

18 197 Cal. App. 3d at 1172-74 (invalidating the county's finding of

19 economic infeasibility because the record contained no financial

20 data, such as "estimated costs, projected income, or expenses"

21 for reduced-size alternative).  Accordingly, the County's finding

22 that Alternative 6 is economically infeasible is not supported by

23 substantial evidence.

24              2.    Adequacy of the EIR-EIS's Alternative 6 Analysis

25                    Under CEQA

26        Plaintiffs also contend that the EIR-EIS failed to

27 adequately explain why the reduced-size alternative (Alternative

28 6) and any other smaller-scale alternative were rejected as

54

economically infeasible, thereby precluding meaningful public

participation.  (Pls.' Reply at 17:18-19.)  Plaintiffs explain

that they are not claiming that CEQA requires a feasibility

analysis to be included in the EIR-EIS.  (Id.); see San

Franciscans Upholding the Downtown Plan v. City & Cnty. of S.F.,

102 Cal. App. 4th 656, 690-91 (1st Dist. 2002) (CEQA does "not

require the EIR itself to provide any evidence of the feasibility

of . . . alternatives, much less an economic or cost analysis of

the various project alternatives and mitigating measures

identified by the EIR.").  Indeed, CEQA requires only that

"alternatives and the reasons they were rejected . . . be

discussed in the EIR in sufficient detail to enable meaningful

participation and criticism by the public."[16]  Laurel Heights, 47

Cal. 3d at 404.  The court here limits its discussion to the EIR-

EIS's analysis of Alternative 6, given that it has found that the

EIR-EIS did not need to consider an additional reduced-size

alternative.

        The EIR-EIS stated that the ski resort needs to

increase mid-week ticket sales by an average of 400 in order to

generate sustainable revenues and at minimum cover operating

costs.  (AR 2751.)  It explained that although the resort

generates sufficient weekend and holiday skier visits, it needs a

---

[16]    Plaintiffs also rely on the Guidelines, which require
that the EIR "briefly explain the reasons" underlying an
infeasibility determination.  See Guidelines § 15126.6(c).  This
provision, however, applies only to alternatives that were
rejected as infeasible during the scoping process.  Id. ("The EIR
should also identify any alternatives that were considered by the
lead agency but were rejected as infeasible during the scoping
process and briefly explain the reasons underlying the lead
agency's determination.").

1    minimum of 316 onsite tourist accommodation and residential units
2    to generate the additional 400 ticket sales per day.  (<u>Id.</u>
3    (explaining the assumptions behind this calculation).)  It then
4    concluded that Alternative 6, with 282 planned units, or any
5    smaller alternative, would therefore be financially infeasible.
6    (<u>Id.</u>)

7          Here, the EIR-EIS's failure to discuss whether
8    Alternative 6's additional revenue streams would enable the ski
9    resort to be financially viable in the future did not allow for
10   "participation and criticism by the public."  <u>Laurel Heights</u>, 47
11   Cal. 3d at 404.  The EIR-EIS misleads the public by suggesting
12   that ticket sales revenue is the only relevant factor in
13   assessing the financial viability of Homewood, when in fact the
14   BAE memoranda clearly show that other revenue streams are
15   critical to the resort's financial viability.  To be clear, the
16   court is not requiring duplication of the financial analysis in
17   the administrative record in the EIR-EIS.  But to adequately
18   explain the reasons it has rejected Alternative 6, the EIR-EIS
19   must at least explain that Alternative 6's additional revenue
20   streams and sources of capital--including the probable capital
21   investments it could attract and profits from the real estate
22   development--are insufficient to ensure its financial viability.
23   Accordingly, the EIR-EIS's analysis of Alternative 6 is
24   inadequate under CEQA.

25          3.   <u>EIR-EIS's Alternatives Analysis and TRPA's</u>
26               <u>Infeasibility Finding under the Compact</u>

27          The Compact requires consideration of alternatives to
28   the proposed project.  (Compact art. VII(a)(2)(C), (a)(3).)  It

56

also requires that TRPA make findings of infeasibility for a project's alternatives when the project has significant and unavoidable impacts. (Id. VII(d)(2).) Additionally, TRPA must "take account of and . . . seek to harmonize the needs of the region as a whole" in formulating and maintaining the Regional Plan. (Id. art. V(c).) Plaintiffs argue that the EIR-EIS failed to provide any meaningful analysis of the financial feasibility of Alternative 6, or any other alternative, and that this violated the Compact's mandate to consider the needs of the region as a whole. The court rejects plaintiffs' contention that TRPA's duty in this regard required it to include more detailed financial information in the EIR-EIS than required by CEQA. Instead, for the same reasons that the EIR-EIS's explanation for rejecting Alternative 6 was inadequate under CEQA, it is also inadequate under the Compact's requirement to consider alternatives to a project. Likewise, TRPA's finding that Alternative 6 is economically infeasible is not supported by substantial evidence.

In addition to analysis of alternatives to a project, the Compact requires an EIS to "[s]tudy, develop and describe appropriate alternatives to recommended courses of action for any project which involves unresolved conflicts concerning alternative uses of available resources." (Id. art. VII(a)(3).) Contrary to plaintiffs' assertions, the court finds this provision to have little bearing on the level of analysis that must be present in an EIS beyond an alternative's description. Instead, this provision appears to speak to the range of alternatives that must considered under specific circumstances.

1  V.    Verification of Existing Land Coverage

2          Plaintiffs argue that the EIR-EIS failed to adequately

3  describe the amount of existing "land coverage" in the Project

4  area.  They view this flaw as contaminating various other

5  elements of and conclusions in the EIR-EIS, including its ability

6  to ensure that there is enough land coverage available to restore

7  to allow for new hard coverage and to mitigate excess coverage

8  and its analysis of water quality impacts, as well as the

9  adequacy of TRPA's findings that the Project complied with the

10 coverage removal and restoration requirements prerequisite to

11 approval of additional height under the CEP and Code section

12 22.4.G.

13         A.    EIR-EIS's Description of Existing Soft Coverage

14         The Code governs new developments' need for the

15 creation of new coverage of land.  Among other things, it sets

16 limits on the maximum percentage of a parcel of land that may be

17 covered ("allowable base coverage"), Code §§ 20.3.A., 20.3.B, and

18 the manner and conditions under which coverage may be either

19 "transferred" between parcels, id. §§ 20.3.B, 20.3.C., or

20 "relocated" within a project area, id. § 20.5.C.  The Code uses a

21 direct offset method; to put it simply, for each square foot of

22 coverage created in one place, a square foot of coverage must be

23 removed from another.  (See RP at II-12.)  The Code also has a

24 land banking program, in which land coverage that has been

25 removed from a parcel "may be credited to the parcel account, if

26 such coverage or units is verified by TRPA as legally existing on

27 or after October 15, 1986."  Code § 38.2.C.  "Existing" is

28 defined in the Code as "[l]egally present or approved on the

effective date of the Regional Plan or subsequently legally

constructed, commenced or approved pursuant to necessary

permits." Id.

Land coverage to be used on the site for restoration

purposes and the resultant land coverage that will result from

the Project comes from verified existing land coverage retained

in its current location or relocated from within the Project area

in accordance with Code section 20.5.C. (See AR 3966).

Relocation is permitted for existing land coverage on the same

parcel or project area. Id. § 20.4.C. For the relocation of

coverage, there must be restoration "to cause the area to

function in a natural state with provisions for permanent

protection from further disturbance." Id. § 20.4.C; see id. §

20.5.C(2).

The Code defines "land coverage" as:

1) A man-made structure, improvement or covering, either
created before February 10, 1972 or created after
February 10, 1972 pursuant to either TRPA Ordinance No.
4, as amended, or other TRPA approval that prevents
normal precipitation from directly reaching the surface
of the land underlying the structure, improvement or
covering . . . ; and

2) lands so used before February 10, 1972, for such uses
as for the parking of cars and heavy and repeated
pedestrian traffic that the soil is compacted so as to
prevent substantial infiltration.

Id. § 2.2. The two types of coverage are referred to as "hard

coverage" and "soft coverage," respectively. Id. Examples of

hard coverage include roofs, decks, surfaces covered with asphalt

or concrete, roads, and parking lots. Id. Hard coverage does

not include structures, improvements, or coverings "that permit[]

at least 75 percent of normal precipitation directly to reach the

59

1   ground and permit[] growth of vegetation . . . ."   Id.

2              Plaintiffs argue that for land to qualify as "soft

3   coverage" two requirements must be met: (1) it must have been in

4   use before February 10, 1972, for such uses as parking cars or

5   heavy pedestrian traffic, and (2) the soil must be compacted so

6   as to prevent substantial infiltration.  In their view, the

7   latter requirement means that the land presently prevents

8   substantial infiltration.  In other words, the coverage must be

9   permanent.  Plaintiffs base this interpretation on the

10  definition's use of the present tense ("the soil is compacted")

11  and how soft coverage is categorized in the Code and Regional

12  Plan as a "permanent land disturbance."  See Code § 20.4 ("No

13  additional land coverage or other permanent land disturbance

14  shall be permitted in [certain areas]."); (RP at IV-15, IV-25

15  ("No new land coverage or other permanent disturbance shall be

16  permitted in [certain areas].")).  In contradistinction to soft

17  coverage, under the Code a "land disturbance" is a broader

18  category of land, which may include permanent disturbances, but

19  also more ephemeral or only temporary disturbances.  See Code §

20  2.2 (defining "land disturbance" as "[d]isruption of land that

21  includes alteration of soil, vegetation, surface hydrology, or

22  subsurface hydrology on a temporary or permanent basis"); see

23  also id. § 20.4.C (noting that land that has been disturbed and

24  or consists of hard or soft coverage may be eligible for credit

25  for restoration).

26             Defendants initially appeared to approach the issue

27  from a different angle.  They suggested in their briefs that

28  present infiltration rates are not relevant to whether soft

coverage legally "exists" on a parcel.  (Defs.' Reply at 28:8-9
(Docket No. 58).)  Instead, the verification process requires
that TRPA determine whether land coverage existed at the time the
Regional Plan was adopted.  See Code § 38.2.C ("Land coverage and
units of use may be credited to the parcel account, if such
coverage or units is verified by TRPA as legally existing on or
after October 15, 1986."); id. § 2.2 (defining "existing" as
"[l]egally present or approved on the effective date of the
Regional Plan or subsequently legally constructed, commenced or
approved pursuant to necessary permits").[17]  This approach is
necessarily predicated on an interpretation of soft coverage that
reads the second prong of the definition ("the soil is
compacted") as a requirement only at the time of creation.  In
other words, soft coverage "exists" if at some point up to 1972,
soil became compacted in such a manner as to prevent substantial
infiltration, regardless of whether that soil is still compacted
today.  In defining soft coverage this way, defendants appeared
to adopt a view of the Regional Plan's land coverage scheme that
envisioned that the status quo in 1972 (or by 1986, after which
the Plan was finally adopted) would be the baseline from which
decisions about development would be made.  Allowable land
coverage would never exceed what existed at that time.

        At oral argument, however, counsel for TRPA stated that
present infiltration rates are relevant to determining whether
soft coverage exists.  The court therefore concludes that for
land to be soft coverage, it: (1) must have been in use before

---

[17]    The Regional Plan was adopted in 1987.

61

February 10, 1972, for such uses as parking cars or heavy

pedestrian traffic, and (2) the soil must be presently compacted

so as to prevent substantial infiltration.  See Bassiri v. Xerox

Corp., 463 F.3d 927, 930 (9th Cir. 2006) ("[W]here an agency

interprets its own regulation, even if through an informal

process, its interpretation of an ambiguous regulation is

controlling under Auer unless 'plainly erroneous or inconsistent

with the regulation.'" (quoting Auer v. Robbins, 519 U.S. 452,

461 (1997))).

        Plaintiffs dispute the propriety of how TRPA verifies

soft coverage, arguing that it uses no actual measurements or any

other objective criteria to verify that soil prevents substantial

infiltration before it is restored.  They rely on the Code's

definition of "hard coverage" to inform what would constitute

"substantial infiltration" and argue that some of the roads TRPA

verified as soft coverage did not prevent substantial

infiltration because before restoration they allowed for rates of

infiltration of fifty-six and seventy-five percent.  (Pls.' Mem.

at 33:26.)  Moreover, many of the verified roads supported

vegetation, likewise indicating that they are not coverage.  (Id.

at 34:2-3.)  Plaintiffs also state that infiltration rates on

certain roads did not appreciably increase following restoration.

(Id. at 34:11-15.)  They note TRPA's reliance on aerial photos

and maps showing that unpaved roads existed in 1972 ignores the

definitional requirement that the land currently prevent

substantial infiltration to be soft coverage.  They conclude

accordingly that substantial evidence does not support that much

of the verified soft coverage is existing coverage and could be

1  validly banked.

2       Defendants respond that the Code does not define

3  "substantial infiltration" and that the court should defer to its

4  chosen methodology for determining whether land presently

5  prevents substantial infiltration, rather than requiring the

6  quantitative system preferred by plaintiffs.  TRPA has already

7  verified 1,781,447 square feet of coverage on the Homewood

8  Property, (AR 3452), of which 1,473,060 square feet is soft

9  coverage, (id. at 3485).  The majority of the soft coverage

10  verified consists of dirt roads.  Id.  TRPA argues that its

11  determination that dirt roadways are generally sufficiently

12  compact to be "soft coverage" is based on substantial evidence

13  and should not be disturbed.

14       The court will uphold TRPA's determinations of soft

15  coverage if they are rational and supported by substantial

16  evidence.  Compact VI(j)(5); Cal. Pub. Res. Code § 21168.5.  The

17  court's "duty is not to pass on the validity of the conclusions

18  expressed in the EIR, but only on the sufficiency of the report

19  as an informative document."  Eureka Citizens for Responsible

20  Gov't, 147 Cal. App. 4th at 372; cf. Native Ecosystems Council v.

21  Weldon, 697 F.3d 1043, 1051 (9th Cir. 2012) ("A court generally

22  must be at its most deferential when reviewing scientific

23  judgments and technical analyses within the agency's expertise

24  under NEPA." (internal quotation marks and citation omitted)).

25       To determine soft coverage on the Homewood property,

26  TRPA compared existing dirt roads to a 1969 U.S. Forest Service

27  aerial photograph, made field measurements, and visited the sites

28  of particular road segments.  (See AR 3966-68 (explaining the

verification and banking process).)  TRPA adopted dirt roads as a proxy for soft coverage because "years of TRPA's staff experience, with the concurrence of other expert agencies, has taught that the compaction of these bare dirt surface[s] leads to substantial sediment runoff as a result of failing to infiltrate and thereby eroding the road surface."  (Defs.' Mem. in Supp. of Summ. J. ("Defs.' Mem.") at 51:8-12 (Docket No. 47-1).)  And because dirt roads are generally permanent in nature due to the compaction and erosion associated with such features, they also indicate that substantial infiltration is not presently occurring.  (See Defs.' Reply at 28:13 n.14.)  Thus, this methodology allowed TRPA to ensure that verified land was both in use by 1972 as a road and is presently compacted so as to prevent substantial infiltration.

As additional evidence to support this methodology, defendants cite to various sources in the record explaining that disturbed and compacted land, including dirt roads, should be restored because they result in soil loss and surface runoff that affects the water quality of Lake Tahoe.  (See id. at 51:8-25; see, e.g., AR 3520; TAR 4413, 10051-53).  Defendants note that other expert agencies agree with TRPA that disturbed areas, including roads, should be restored.  (Id. at 5951, 5954.) TRPA's consultant, Integrated Environmental Restoration Services, which assisted HMR with restoration projects, verified that unpaved roads at Homewood "are generally characterized by highly compacted soil conditions, low to no surface cover, and elevated runoff and sediment rates."  (AR 3526.)  This evidence is also relied on by TRPA to support its conclusion that dirt roads are

1   generally permanent.[18]   (See Defs.' Reply at 28:13 n.14.)

2           The court finds that substantial evidence supports

3   TRPA's use of dirt roads as a proxy for "soft coverage."[19]

4   TRPA's interpretation of the Code requires TRPA to choose a

5   method to verify that coverage existed in 1972 and presently

6   prevents substantial infiltration.  Presented with this difficult

7   task, TRPA reasonably adopted the assumption, based on

8   substantial evidence, that a dirt road in existence by 1972

9   continues to prevent substantial infiltration.  Plaintiffs may

10  prefer a methodology that takes a more quantitative approach to

11  determining "substantial infiltration" but TRPA's method is

12  reasonably adapted to determine whether land meets the two prongs

13  of the soft coverage definition.  Cf. The Lands Council, 537 F.3d

14  at 1000 ("'When specialists express conflicting views, an agency

15  must have discretion to rely on the reasonable opinions of its

16

17          [18]   Defendants explain that, "[b]ecause TRPA did not create
    a full inventory of land coverage when the Regional Plan was
18  adopted, it must use an alternative method to determine if
    coverage existed at that time."  (Defs.' Reply at 26:12-13; see
19  also AR 4019 ("Infiltration measurements taken prior to
    restoration work do not represent infiltration measurements taken
20  during land coverage verifications and clearly do not represent
    infiltration rates present on February 10, 1972 or at the time of
21  the Regional Plan Adoption in 1987.").)  This argument is only
    applicable if soft coverage need not presently prevent
22  substantial infiltration.  TRPA rejected this interpretation of
    soft coverage, however, at oral argument.   Thus, it does not
23  help TRPA to show that its methodology to determine soft coverage
    is supported by substantial evidence.

24          [19]   Relatedly, plaintiffs argue that the EIR-EIS improperly
25  deferred responses to their comments that specific road segments
    were not properly identified as coverage.  (See Pls.' Mem. at
26  34:1 n.18.)  Because TRPA's method of determining soft coverage
    is supported by substantial evidence, the court does not find
27  that TRPA's decision to respond to inquiries about particular
    road segments until the banking application and approval process
28  precluded the public from being adequately informed about the
    accuracy of TRPA's coverage determinations.  (See AR 4019.)

1  own qualified experts even if, as an original matter, a court

2  might find contrary views more persuasive.'" (quoting <u>Marsh v.</u>

3  <u>Or. Natural Res. Council</u>, 490 U.S. 360, 378 (1989))).   TRPA's

4  chosen methodology may not result in perfection, but it is not

5  the court's role to mandate so much.   Accordingly, the court

6  finds that the EIR-EIS's determination of the amount of existing

7  soft coverage in the Project area is supported by substantial

8  evidence.

9        B.   <u>Use of TRPA's Soft Coverage Determinations in the EIR-</u>

10            <u>EIS</u>

11        Plaintiffs contend that TRPA's method of determining

12 soft coverage resulted in an unreliable verification of total

13 soft coverage and banked coverage.   As a result, the EIR-EIS does

14 not adequately support the conclusion that sufficient restoration

15 credits exist to offset the Project's extensive new coverage.

16 And to the extent that the Project's new coverage is not offset

17 by the restoration of actual existing land coverage, the Project

18 will have unexamined and unmitigated significant impacts on soil

19 and water resources in violation of CEQA and the Compact.

20        As to the Project's soil impacts, Plaintiffs argue that

21 "the unreliable soft coverage numbers" undermine the EIR-EIS's

22 conclusion that the Project's existing excess coverage can be

23 mitigated to a less than significant level, as required by TRPA's

24 Excess Land Coverage Mitigation Program.[20]   (Pls.' Reply at

25

26        [20]   Defendants argue that plaintiffs did not raise any
27 arguments regarding the EIR-EIS's conclusions on soil impacts
   during the administrative process.   (Defs.' Mem. at 50 n.10.)
28 Regardless, the court rejects the argument as without merit
   above.

30:10-19.)  Because TRPA's soft coverage determinations are
supported by substantial evidence, this argument must be
rejected.  Accordingly, the EIR-EIS accurately disclosed the
Project's impacts on soil.  Likewise, substantial evidence
supports the EIR-EIS's conclusion that the Project's significant
soil impacts will be mitigated to a less than significant level.

As to the Project's water quality analysis, even if
defendants are incorrect and the amount of verified coverage
impacts the water quality analysis because that analysis relies
on a computer model with a "dirt road" input, TRPA's soft
coverage determinations are supported by substantial evidence,
and plaintiffs' argument must be rejected.  Accordingly, the
EIR-EIS accurately disclosed the Project's impacts on water
quality.  For the same reason, the EIR-EIS's finding that soft-
coverage restoration efforts will improve infiltration is
supported by substantial evidence.

C.   Validity of TRPA's CEP and Additional Height Findings

In addition to offsetting its creation of new coverage,
the Project needs to restore existing land coverage to mitigate
excess existing coverage over the allowable base land coverage
limits, as required by the Excess Land Coverage Mitigation
Program.  (AR 3486.)  To mitigate this existing coverage, it will
permanently retire 174,373 square feet of coverage.  (Id. at
3496.)  It also needs to restore "substantial coverage" for its
participation in the CEP and to permanently retire at least ten
percent of the Project area's coverage to obtain additional
height pursuant to Code section 22.4.G(1)(b).  (Id. at 7299; TAR
639.)  The latter provision requires retirement of 176,134 square

1  feet.  (AR 3496.)

2          Plaintiffs argue that TRPA's unsupported soft coverage

3  determinations undermine the EIR-EIS's conclusion that there is

4  sufficient coverage available within the Project area to restore

5  and bank to meet the requirements of the CEP and Code section

6  22.4.G(1)(b).  Relatedly, plaintiffs argue that TRPA cannot rely

7  on the same retired square feet of coverage to fulfill the CEP

8  requirements and to mitigate the existing excess coverage at the

9  site and obtain additional height.  Similarly, they argue that

10 the Project cannot rely on the same retired square feet to both

11 mitigate the existing excess coverage at the site and meet the

12 requirements of Code section 22.4.G(1)(b).

13         The first argument must be rejected because the court

14 has already found that TRPA's determination of soft coverage is

15 supported by substantial evidence.  As to the second argument, to

16 participate in CEP, projects must provide "substantial

17 environmental benefits or mitigation in excess of TRPA's project

18 mitigation requirements."  Code § 33.3.D(3).  For the Project,

19 CEP required "substantial land coverage reduction."  (AR 7299.)

20         Although the Project will arguably not permanently

21 retire substantially more coverage than it is required to retire

22 to mitigate existing excess land coverage, it does permanently

23 retire enough coverage to produce "substantial land coverage

24 reduction."  (See AR 7299 (explaining that Project will retire at

25 least thirteen percent of total existing land coverage).  The

26 Project also provides numerous environmental benefits beyond

27 those which it is legally required to provide and so even if it

28 restored no coverage beyond that which is otherwise required, it

68

1  could still meet the requirements to participate in the CEP

2  program.  See Code § 33.3; (TAR 766).[21]  The court therefore need

3  not decide whether the same coverage may be counted for the

4  purposes of obtaining additional height and mitigating excess

5  coverage, as well as meeting the CEP requirements.

6        Finally, Code section 22.4.G(1)(b) requires that

7  "[e]xisting verified land coverage otherwise permissible within

8  the Ski Area Master Plan pursuant to the Regional Plan shall be

9  reduced by a minimum of 10 percent and permanently retired . . .

10  ."  Plaintiffs argue that coverage permanently retired under the

11  Excess Land Coverage Mitigation Program is not "otherwise

12  permissible" because it must be removed for the Project to

13  proceed.  Thus, the coverage removed for that purpose cannot be

14  counted as the coverage retired for additional height.

15  Plaintiffs failed to exhaust this argument.  Although the

16  amendment was not in effect until Project approval, it was part

17  of the Project and the Project was intended to meet any

18  requirements it might impose.  Plaintiffs had an opportunity to

19  raise this issue during the environmental review process and

20  failed to do so.  Moreover, exhaustion is apropos because there

21  is a dispute over the interpretation of an agency's regulation

22  and the agency should be given an initial opportunity to

23  interpret that regulation.

24        Accordingly, TRPA's findings that the Project is

25

26        [21]   The record also shows that even without the ten percent
   of existing coverage that must be permanently restored to obtain
27  extra height (and the slightly smaller amount to mitigate
   existing coverage), that coverage is only part of the 500,000
28  square feet in total that the Project plans to restore.  (AR
   7299.)

69

1  consistent with CEP, the Excess Land Coverage Mitigation Program,

2  and Code section 22.4.G's requirements are supported by

3  substantial evidence.

4  VI.   The EIR-EIS's Air Quality Analysis

5       A.   Adequacy of Mitigation Measure for Air Quality Impacts

6            The EIR-EIS concluded that the Project will have

7  significant air quality impacts from increased VMT.[22]  (AR 3360.)

8   During the winter ski season, the existing VMT is higher than

9  the VMT estimated with the proposed project because "the

10 residential units and hotels rooms would result in

11 internalization between Project uses, reducing the external trips

12 generated as compared to existing conditions."  (Id. at 3361.)

13 During the summer, however, the VMT will increase from 0 VMT to

14 an estimated 8,431 VMT.  (Id.)  The EIR-EIS also concluded that

15 the Project, considered jointly with other planned projects in

16 the region, will have significant cumulative long-term air

17 quality impacts from both increased VMT and emissions from area

18 and stationary sources.  (Id. at 3386.)

19           To mitigate these air quality impacts to a less than

20 significant level, the Project proposes to make contributions to

21 the Traffic and Air Quality Mitigation Fund ("Mitigation

22 Program") under Chapter 93 of the Code.  (Id. at 3378, 3386.)

23 TRPA adopted the Mitigation Program to generate sufficient

24

25       [22]   The EIR-EIS also determined that although stationary
26 source emissions from the Project will not generate emissions in
   excess of the significance threshold, there is a possibility that
27 the future use of wood-burning appliances would generate
   substantial emissions.  (AR 3377.)  The EIR-EIS finds this to be
28 a significant impact and provides another mitigation measure to
   reduce it to a less than significant level.  (Id.)

revenue to address air quality impacts associated with VMT.  (<u>Id.</u> at 3378.)  The fund is "used for activities that reduce VMT or otherwise reduce air pollutant emissions from automobiles."  (<u>Id.</u> at 3960.)  The EIR-EIS explains that "[b]y contributing to TRPA's Mitigation Program, the Project effectively mitigates air quality emissions through VMT reductions achieved through [the] Mitigation Program, as VMT reductions typically result in reductions of air pollutant emissions."  (<u>Id.</u> at 3378.)

As the EIR-EIS explains, TRPA tracks the Mitigation Program's funds and disburses them at the request of the local jurisdiction from which they are collected, or the Tahoe Transportation District, if "the expenditure is consistent with TRPA's Regional Transportation Plan or the 1992 Air Quality Plan."  (<u>Id.</u> at 3960.)  The EIR-EIS states that strategies that may be funded by the Mitigation Program to mitigate the Project's air quality effects could include: "[e]xpansion of existing transit facilities; [a]ddition of bicycle lanes; Transportation Systems Management measures such as bicycle facilities, pedestrian facilities, and use of alternative fuels in fleet vehicles; and [p]rovision of connectivity between multi-use paths for bicycles and pedestrians."  (<u>Id.</u> at 3378.)  Chapter 93 provides a fee schedule that sets varying fees per vehicle trip, depending on the project.  <u>See</u> Code § 93.3.D.

1.   CEQA

Plaintiffs first challenge the EIR-EIS's study of mitigation measures under CEQA.  A brief restatement of the appropriate standard of review is first in order.  Under CEQA, the court must determine whether TRPA and the County

71

prejudicially abused their discretion either by not proceeding in the manner required by law or by making a decision not supported by substantial evidence.  Cal. Pub. Res. Code § 21168.5; <u>Laurel Heights</u>, 47 Cal. 3d at 392.  It "presume[s] the correctness of the agency's decision and the petitioners thus bear the burden of proving that the EIR is legally inadequate or that the record does not contain substantial evidence to support the agency's decision."  <u>Save our Peninsula Comm. v. Monterey Cnty. Bd. of Supervisors</u>, 87 Cal. App. 4th 99, 139 (6th Dist. 2001).  Plaintiffs here challenge the adequacy of the EIR-EIS's discussion of Mitigation Measure AQ-2a for the Project's air quality impacts, requiring the court to consider whether TRPA and the County failed to proceed in a manner prescribed by CEQA.  <u>Vineyard Area Citizens</u>, 40 Cal. 4th at 435 (question of the sufficiency of CEQA as an informational document is one of law).  They also challenge the County's findings that the Project's significant air quality effects will be reduced to less than significant, requiring the court to consider whether the County's conclusion is supported by substantial evidence.

If the EIR is the heart of CEQA, then mitigation is its teeth.  <u>Envtl. Council of Sacramento v. City of Sacramento</u>, 142 Cal. App. 4th 1018, 1039 (3d Dist. 2006).  CEQA requires that an EIR set forth the ways in which a project's significant effects on the environment can be mitigated by proposing mitigation measures that will minimize those effects.  Cal. Pub. Res. Code § 21100(b)(3); <u>see also</u> <u>id.</u> §§ 21002.1(a), 21061.  The EIR should identify mitigation measures that "could reasonably be expected to reduce adverse impacts if required as conditions of approving

1   the project."  Guidelines § 15126.4(a)(1)(A); <u>Laurel Heights</u>, 47

2   Cal. 3d 376 at 416-17.  Mitigation measures must be feasible--

3   capable of being successfully accomplished in a reasonable amount

4   of time, considering economic, environmental, social, and

5   technological factors--and enforceable.  Guidelines §

6   15126.4(a)(1)-(2); Cal. Pub. Res. Code § 21061.1.  They must also

7   be "'roughly proportional' to the impacts of the project."

8   Guidelines § 15126.4(a)(4)(B).

9          Fee-based mitigation programs have been found to be

10  adequate mitigation measures under CEQA.  <u>See, e.g.</u>, <u>City of</u>

11  <u>Marina v. Bd. of Trs. of the Cal. State Univ.</u>, 39 Cal. 4th 341,

12  364 (2006); <u>Save our Peninsula Comm.</u>, 87 Cal. App. 4th at 141;

13  <u>Napa Citizens for Honest Gov't v. Cnty. of Napa</u>, 91 Cal. App. 4th

14  342, 363 (1st Dist. 2001) ("Fee-based infrastructure can be an

15  adequate mitigation measure under CEQA.").  The CEQA Guidelines

16  specify that such programs are appropriate when the project funds

17  its "fair share" of a mitigation measure designed to alleviate a

18  cumulative impact.  Guidelines § 15130(a)(3).  Plaintiffs do not

19  dispute that the Project could rely on a fee-based mitigation

20  program to reduce its significant air quality impacts.  They

21  argue instead that the EIR-EIS's mitigation analysis is

22  inadequate under CEQA because it fails to show <u>how</u> the Program

23  will offset air quality impacts.  Relatedly, they argue that the

24  EIR-EIS improperly deferred the formulation of mitigation

25  measures.

26         If the EIR-EIS's analysis of the mitigation measure is

27  to be upheld, it must be upheld on the basis articulated in that

28  document.  <u>League</u>, 739 F. Supp. 2d at 1271.  Defendants argue

73

that even if the EIR-EIS's analysis is inadequate, they did not
need to find that the Project's air quality impacts would be
significant. (Defs.' Mem. at 62.)  After the final EIR-EIS was
completed, defendants asked their consultants to produce
supplemental analyses of the Project's vehicle miles traveled
("VMT").  (See TAR 6587-95 (ICF Memorandum), 6596-99 (Fehr and
Peers Memorandum).)  VMT is defined as "[t]he total miles
traveled by a motorized vehicle, or a number of motorized
vehicles, within a specific area or during a specified period of
time." (RP at B-5.)  The supplemental studies showed that based
on the Project's reduction of VMTs associated with the transfer
and retirement of TAUs and "Equivalent Residential Units," the
EIR-EIS significantly overstated the Project's air quality
impacts and that the Project would not result in an annual
increase in VMTs in the basin.  (AR 9006; TAR 9132.)

Additional documentation in the record, however, "does
not make up for the lack of analysis in the EIR." Save our
Peninsula Comm., 87 Cal. App. 4th at 130.  Agencies thwart the
informational purposes of CEQA when they attempt to alter the
conclusions in the EIR after its finalization.  The adequacy of
the EIR-EIS will therefore be considered on the grounds provided
therein.

A fee-based mitigation program is sufficient under CEQA
if there is evidence that mitigation will actually occur. Save
our Peninsula Comm., 87 Cal. App. 4th at 140.  It follows that
simply promising to contribute funds to a fee-based mitigation
program is not a sufficient mitigation measure if the program
will not actually provide mitigation.  See id. at 140 ("Of course

1   a commitment to pay fees without any evidence that mitigation

2   will actually occur is inadequate."). The EIR under review in

3   Communities for a Better Environment v. City of Richmond, 184

4   Cal. App. 4th 70 (1st. Dist. 2010) ("CBE"), did not set forth any

5   particular mitigation measure for the proposed project's

6   greenhouse gas emissions, but instead required the project

7   proponent to hire an independent expert to create a mitigation

8   plan that considered measures suggested in the EIR, which would

9   be approved by the City after the environmental review process.

10  Id. at 92.  The court faulted the EIR for failing to set any

11  standards for successful mitigation and not attempting any

12  calculations as to the reductions the "vaguely described future

13  mitigation measures" would produce.  Id.

14        In contrast to the nascent plan for mitigation in CBE,

15  the Mitigation Program is an established program with well-

16  developed guidelines.  While not all of the specific projects

17  funded by the Mitigation Program have undergone environmental

18  review, TRPA created the program specifically "to offset impacts

19  from indirect sources of air pollution," Code § 93.0, and the

20  Mitigation Program itself underwent environmental review when it

21  was adopted as part of the Regional Plan, (AR 13820; Defs.' Mem.

22  at 66:23 n.20).  The EIR-EIS does not specify which particular

23  projects will be funded, it only lists a few possible projects

24  that the mitigation fee could support.  It does, however, explain

25  that the Mitigation Program must expend its funds in compliance

26  with TRPA's 1992 Air Quality Plan or Regional Transportation Plan

27  ("RTP").  (AR 3960.)  The Air Quality Plan consists largely of

28  measures implemented by TRPA to attain and maintain air quality

1  standards in the Region, such as Code section 91.7's limitations
2  on idling. (See TAR 8961-8963 (explaining the elements of the Air
3  Quality Plan).)   The RTP has the primary objective of attaining
4  and maintaining the Compact's thresholds by creating a program
5  "to research, plan, and coordinate potential mitigation
6  activities . . . ."  (Id. at 8612; see id. at 8590-664 (Lake
7  Tahoe Regional Transportation Plan).)

8       While not in the body of the EIR-EIS, the RTP is
9  referenced therein and is in the record.  It explains in
10  exhaustive detail the mobility-related projects that the
11  Mitigation Program provides funding for as part of an overall
12  effort to attain the thresholds.  (See id.)  Just two examples of
13  the thirty-six planned projects include the U.S. 50 Pedestrian
14  and Bicycle Improvements Project and specific measures to attract
15  and retain transit users for the publically operated transit
16  center.  (Id. at 8627, 8633, 8642).  The RTP also includes the
17  cost estimates, project objectives, and anticipated completion
18  dates for all the projects.  (Id. at 8624.)  In CBE, the court
19  recognized that because there was no set mitigation measure, more
20  detailed analysis was required for the EIR to adequately show
21  that mitigation would occur.  Here, the Mitigation Program has
22  funded and will continue to fund carefully developed projects;
23  there is no doubt that mitigation will occur.

24       Nor is payment to the Mitigation Program improper
25  deferral.  In CBE, the court found improper deferral in the EIR
26  where "there was no assurance that the plan for how the
27  [p]roject's greenhouse gas emissions would be mitigated to a net-
28  zero standard was both feasible and efficacious, and [it] created

no objective criteria for measuring success." 184 Cal. App. 4th
at 95. In contrast, the Project has committed to mitigation: it
will pay the appropriate fee under Chapter 93 to the Mitigation
Program, which is already in place and driven by the
comprehensive RTP. It is especially appropriate here for the
Project to contribute to the Mitigation Program because VMT-
related emissions are a regional pollutant and must be combated
on a regional basis. In contrast to the failure to develop a
plan for mitigation at the time of the EIR's production in <u>CBE</u>,
the EIR-EIS here has clearly not "plac[ed] the onus of mitigation
to [a] future plan and [left] the public 'in the dark about what
land management steps will be taken, or what specific criteria or
performance standard will be met.'" <u>Id.</u> at 93 (quoting <u>San
Joaquin Raptor Rescue Ctr. v. Cnty. of Merced</u>, 149 Cal. App. 4th
645, 670 (5th Dist. 2007)).

        The EIR-EIS does not provide analytical data showing
that mitigation will occur, which was noted as a deficiency in
<u>CBE</u>. Mathematical precision is not needed in this case, however,
to inform the public and decision makers that mitigation will
occur. Unlike the unformed and incomplete measures at issue in
that case, "we must presume and expect that the [agency] will
comply with its own ordinances, and spend the fees it collects on
the appropriate improvements . . . ." <u>Save our Peninsula Comm.</u>,
87 Cal. App. 4th at 141. In lieu of such numbers, assurance that
the Project is contributing enough to mitigate its share of air
quality impacts in the region is provided by the fact that the
fee it must pay is determined by the amount of VMTs it will
contribute. <u>See</u> Code § 93.3.D.

1    The Mitigation Program's fee is set to ensure that

2  there is sufficient funding for its air quality mitigation

3  projects.  Id. § 93.6 (requiring TRPA to make a biennial review

4  of the fee schedule in light of the costs of needed improvements

5  and the funds available to support those improvements); cf.

6  Guidelines § 15130(a)(3) ("A project's contribution is less than

7  cumulatively considerable if the project is required to implement

8  or fund its fair share of a mitigation measure or measures

9  designed to alleviate the cumulative impact.").  Although

10 defendants should have provided in the EIR-EIS how the fee is

11 calculated, as well as the actual fee it must pay, this error is

12 not prejudicial.[36]  See Cal. Pub. Res. Code § 21005.

13    Furthermore, it would make no sense to require what is

14 tantamount to de novo environmental review of an established fee-

15 based mitigation program each time such a program is used as a

16 mitigation measure.  The Mitigation Program is part of an

17 important collective effort at addressing a problem that cannot

18 be ameliorated with piecemeal efforts.  (A bus stop at Homewood

19 is useless in encouraging visitors and residents to use public

20 transportation if there are not bus stops throughout the Region.)

21 It helps to fund the RTP, which not only encompasses carefully

22

23    [36]    Plaintiffs argue on reply that because the mitigation
   fee will be based on the peak summer increase in vehicle daily
24 trips minus the reduction in winter vehicle daily trips, instead
   of the peak summer increase, payment to the Mitigation Fund will
25 not assure that the peak summer increase in VMT and resulting
   cumulative ozone impacts are adequately mitigated.  (Pls.' Reply
26 at 39:7-10.)  Defendants counter that the argument has not been
   exhausted, but the court finds it has no merit.  Calculation of
27 fees is set by the Mitigation Program, not the Project.
   Moreover, as explained above, the fee schedule is updated
28 biennially to ensure that the program has sufficient funds in
   light of the costs of needed improvements.  Code § 93.6.

developed long-term and on-going strategies to reduce dependence on private automobile travel, but also has prioritized six regionally significant projects that in many cases have had preliminary planning, public review, and environmental documentation.  (TAR 8624.)  Plaintiffs complain that the RTP sets no specific targets or performance measures for emissions or vehicle trip reductions.  (Pls.' Reply at 38:8-11.)  However, the RTP is intended to help achieve the thresholds, which do provide such standards.  (See TAR 8612.)

A mitigation fund loses its effectiveness if each time a project intends to contribute to it as a mitigation measure it faces a collateral attack demanding that all the research and planning behind it be reproduced.  The Mitigation Program and the RTP are briefly discussed in the EIR-EIS and the details of both are in the record and publically available.  (See AR 3960 (explaining that expenditure of funds from Mitigation Program must be consistent with RTP).)  For an established program adopted specifically to address air quality in the Region, that is adequate, even where analytical data is not provided in the EIR-EIS itself.

Finally, in Save Our Peninsula, the EIR contained a comprehensive traffic analysis that identified problem areas on two roads and recommended mitigation in the form of fees paid to a traffic impact fee program established by county ordinance and designed to implement road improvements as needed.  87 Cal. App. 4th at 139.  Planned improvements included "intersection channelization and passing lanes," as well as twelve proposed interim projects based on a county-adopted "Deficiency Plan."

Id. at 141.  Petitioners argued "that the EIR failed as an informational document because it failed to tie the fee mitigation plan to the actual physical impacts of the project on the environment . . . [and] claimed the EIR mitigation plan must identify the nature of specific improvements and their timing and how the improvements would mitigate the impact of the increased traffic."  Id. at 137-38.[37]  The court rejected these arguments, explaining: "All that is required by CEQA is that there be a reasonable plan for mitigation."  Id. at 141.[38]

Plaintiffs attempt to distinguish Save Our Peninsula and other cases approving fee-based mitigation programs on the grounds that the contributed funds were to be applied to specifically defined projects that were described in the EIR.[39]

---

[37]  Plaintiffs attempt to distinguish this case on the grounds that it was concerned with whether implementation would occur in a timely matter.  Although the court did address this concern, it also clearly addressed the substantive adequacy of the payment of fees as a mitigation measure.

[38]  For the development project in Endangered Habitats League v. County of Orange, 131 Cal. App. 4th 777 (4th Dist. 2005), to reduce its impact on traffic on a specific road to a less than significant level, it planned to contribute to two existing fee programs to fund road improvements.  Id. at 784.  The court disapproved of contribution to these programs as a mitigation measure because there was neither evidence of the specific improvements that would be funded by the programs nor evidence that the mitigated project would achieve the required service level.  Id. at 785.  However, any persuasive value of the case is minimal given that the issue before the court was whether the project complied with the City's general plan, not whether the EIR's discussion of the mitigation measure was sufficient under CEQA.  Defendants' reliance on friends of Lagoon Valley v. City of Vacaville, 154 Cal. App. 4th 807 (1st Dist. 2007), is unpersuasive for the same reason.  See id. at 817 (appellant arguing that project was inconsistent with City's general and policy plans).

[39]  Plaintiffs also cite Napa Citizens for Honest Government for the proposition that mitigation funds must be applied to specifically defined projects described in the EIR.

1   See, e.g., City of Marina, 39 Cal. 4th 341 at 363-64; Envtl.

2   Council of Sacramento, 142 Cal. App. 4th at 1039; Save Our

3   Peninsula, 87 Cal. App. 4th at 140-41.  As explained above,

4   however, the EIR-EIS incorporates by reference the RTP and its

5   detailed analysis of the specific projects that the Mitigation

6   Program will fund.  Moreover, none of the courts in those cases

7   held that fee-based mitigation is inadequate unless the EIR

8   specifically identifies which projects the fees will fund.

9   Although more detail could have been provided in the body of the

10  EIR-EIS, it adequately, if imperfectly, informed the public that

11  mitigation would occur.

12          The EIR-EIS states that to mitigate the Project's air

13  quality impacts, JMA must pay the required fee based on its

14  predicted VMTs to the Mitigation Program, which has and will

15  continue to implement specified projects that are designed to

16  reduce VMT or otherwise reduce air pollutant emissions from

17  automobiles.  This is a "reasonable plan for mitigation."  Save

18  Our Peninsula, 87 Cal. App. 4th at 141.  Accordingly, the court

19  finds that the EIR-EIS's discussion of air quality mitigation

20  measures was adequate under CEQA and that the County's findings

21  that the Project's air quality impacts will be reduced to a less

22  than significant level are supported by substantial evidence.

23          2.   Compact

24          The Compact requires an EIS to include "[m]itigation

25  measures which must be implemented to assure meeting the

26  ─────────────────

27  In that case, however, the EIR rejected payment to a relevant
    mitigation fund as an infeasible mitigation measure.  91 Cal.
28  App. 4th at 363.

81

standards of the region." (Compact art. VII(a)(2)(D).) TRPA
must also make written findings that "[c]hanges or alterations
have been required in or incorporated into [the] project which
avoid or reduce the significant adverse environmental effects to
a less than significant level." (Id. art. VII(d)(1).) In
League, TRPA proposed two programs, the "Blue Boating Program"
and a buoy fee program, to mitigate the air and water quality
impacts of increased motorized boating that would result from
TRPA's approval of the construction of new boating facilities on
Lake Tahoe. 739 F. Supp. 2d at 1279-80. Addressing the
plaintiffs' challenge that the EIS's discussion of mitigation was
inadequate, the court observed that the EIS did not discuss the
potential efficacy of any of the Blue Boating Program's elements
and gave scant, if any, analytical data thereon; failed to
discuss the types of projects that would be funded by the sticker
fees aspect of the Blue Boating Program; and did not reveal
whether there would be sufficient funding to pay for the needed
mitigation. Id. at 1283. It disapproved the buoy fee program
analysis for failing to discuss the aggregate amount by which it
would cause emissions to be reduced. Id.

        The court relied on NEPA caselaw to explain what
constitutes a sufficient discussion of a mitigation measure under
the Compact. Id. at 1282. The court found this to be proper
because both the Compact and NEPA have comparable provisions
requiring a statement of the unavoidable environmental impacts of

82

a project.[40]  <u>Id.</u> at 1281-82.  It also relied on the Compact's
requirement that, when mitigation is feasible, TRPA must make
"'written findings' that 'changes or alterations' will 'avoid or
reduce' environmental harm to insignificance, and these findings
'must be supported by substantial evidence,'" <u>id.</u> at 1281
(quoting Compact art. VII(d)(1)), to hold that the EIS must
include "at a minimum, a 'reasonably complete' discussion of
mitigation measures including 'analytical data' regarding whether
the available measures would achieve the required result," <u>id.</u>

        Two caveats must accompany the <u>League</u> court's
articulation of what constitutes an adequate discussion of
mitigation measures under the Compact.  First, while NEPA caselaw
may provide persuasive authority for interpreting the Compact, it
is not controlling.  Under NEPA, the duty to study possible
mitigation measures stems from the statute's requirement that the
unavoidable adverse effects of a project be studied.  <u>See</u>
<u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 351-52
(1989) (holding that an EIS must consider the extent to which
adverse effects can be avoided by discussing possible mitigation
measures).  Under the Compact, an EIS needs to include
"[m]itigation measures, which must be implemented to assure
meeting standards of the region." (Compact art. VII(a)(1)(D).)
Thus, while NEPA focuses on mitigation measures that ameliorate a
project's adverse impacts, the Compact focuses on measures that

_____

[40]    NEPA requires a statement of "any adverse environmental
effects which cannot be avoided should the proposal be
implemented."  42 U.S.C. § 4332(2)(C)(ii).  The Compact requires
the EIS to identify "[a]ny significant adverse environmental
effects which cannot be avoided should the project be
implemented."  (Compact art. VII(a)(2)(B).)

achieve the Region's standards.  The <u>League</u> court's wholesale

adoption of NEPA caselaw fails to acknowledge this difference in

what each law requires of a mitigation measure and the effect

those particular requirements may in turn have on how a measure

is analyzed in an EIS.  <u>Cf.</u> <u>Comm. for Reasonable Regulation of</u>

<u>Lake Tahoe v. Tahoe Reg'l Planning Agency</u>, 365 F. Supp. 2d 1146,

1156 (D. Nev. 2005) ("NEPA is only persuasive authority for

interpreting Article VII of the Compact . . . ."); <u>Comm. for</u>

<u>Reasonable Regulation of Lake Tahoe</u>, 311 F. Supp. 2d at 992

("[I]t is unclear whether the standards for preparing an EIS

under the NEPA apply to TRPA's interpretation of the Compact and

its Code.").

Second, <u>League</u>'s reliance on TRPA's required findings

is misguided.  Those findings are made by TRPA <u>after</u> the EIS is

completed, on the record as a whole.  While they require

substantial evidence in the record that any mitigation measure

will reduce a significant impact to a less than significant

level, they do not dictate what must be in the EIS specifically.

Given the <u>League</u> court's unsteady reliance on NEPA caselaw and a

Compact provision regarding findings made on the record, the

court considers the case to have lesser persuasive value as to

what the Compact requires in an EIS's analysis of a mitigation

measure.

<u>League</u> is also distinguishable from the present case on

the same grounds as <u>CBE</u>.  The Blue Boating Program and buoy fees

were measures newly conceived for mitigating the anticipated

water and air quality effects from TRPA's approval of the

construction of new boating facilities on Lake Tahoe.  <u>League</u>,

84

739 F. Supp. 2d at 1279.  In the case of the Blue Boating

Program, the EIS admitted that the program was incompletely

developed.  Id.  For its sticker fee component, for example,

"TRPA ha[d] not identified any discussion in the record . . . of

particular potential mitigation efforts" that the collected funds

would be use for.  Id. at 1279-80.  Although the EIS included

some discussion of how the buoy fees would be spent, it did not

explain by how much the program would reduce aggregate emissions.

Id. at 1283.  For these new and untested programs, the court

necessarily required detailed analysis--including analytical

data--as to how they would "suffice to offset the air and water

quality impacts of increased boating."  Id. at 1284.  As

explained above, however, the Mitigation Program is already part

of the Regional Plan and encompasses the RTP's significant

planning efforts.  In this specific case, the details provided in

the EIR-EIS, and the information referenced therein, are

sufficient to show decision makers and the public that mitigation

will occur.  Additionally, JMA's payment of the mitigation fee

addresses the Compact's requirement that mitigation measures

maintain the region's standards because the RTP is designed to

achieve and maintain the thresholds.  (See TAR 8612.)

        Accordingly, the court finds that the EIR-EIS's

discussion of air quality mitigation measures was adequate under

the Compact.  TRPA's findings that the Project's air quality

impacts will be mitigated to an insignificant level and its

mitigation measure will assure meeting the standards of the

region are supported by substantial evidence.

        B.   Validity of TRPA's Air Quality Threshold Findings

Whenever TRPA amends the Regional Plan, it must find "that the Regional Plan, as amended, achieves and maintains the thresholds." Code § 6.4. Likewise, when it amends the Code, it must find that "the Regional Plan, and all of its elements, as implemented through the Code, Rules, and other TRPA plans and programs, as amended, achieves and maintains the thresholds." Code § 6.5. In <u>League</u>, TRPA had "concluded that this obligation [under Code § 6.5] was satisfied because the project included mitigation measures that would ensure that the [Code] Amendments had no significant adverse effects." <u>Id.</u> at 1268. The court explained, however, that for thresholds not in attainment, more is required: "a showing that something--whether the Amendments or something else--will provide the necessary improvement." <u>League</u>, 739 F. Supp. 2d at 1271. As the <u>League</u> court explained:

> Where a threshold is not in attainment, a finding that the problem is not getting worse does not satisfy this provision. Nor is it sufficient to find that, metaphorically, the ball is moving forward. By requiring that the Regional Plan be implemented so as to "achieve," rather than merely "approach," the thresholds, the Compact and Ordinances require a finding that TRPA will make it to the goal. TRPA is correct that Code section 6.5 looks to the entire package of the regional plan, ordinances, etc., rather than to effects specifically attributable to the proposed amendment. Thus, it does not matter whether the proposal at issue will make the scoring shot, or even whether it will be involved in the play. The key is the finding that, one way or another, the thresholds will be achieved.

<u>Id.</u> at 1269. In other words, "[s]ection 6.5 does not require a finding that thresholds have been achieved, it requires a finding that the amended ordinances implement the plan in a way that achieves them." <u>Id.</u> at 1270. The court agrees with plaintiffs that this holding applies equally to Code § 6.4 and defendants do not appear to dispute this.

1    TRPA concluded that the Regional Plan, as amended,
2  achieves and maintains the thresholds.  (TAR 684.)  It based its
3  findings on the analyses of numerous reports and documents,
4  including the EIR-EIS and the 2006 Threshold Evaluation Report
5  ("Report").[41]  (See id.)  TRPA specifically identified the
6  Environmental Improvement Program ("EIP") as a critical component
7  of maintaining and achieving the thresholds, as it has funded
8  over 700 projects and programs designed to help meet the
9  thresholds.[42]  (Id. at 685.)  TRPA next identified the compliance
10  measures in place, as well proposed supplemental measures, which
11  are described in the Report and are intended to promote
12  attainment.  (Id. at 686.)  Examples of the compliance measures
13  include shuttle programs, bikeways, and intercity bus services.
14  (Id. at 7096.)  Also important to its finding is the CEP, which
15  encourages projects having substantial environmental benefits
16  that will further achievement of the thresholds.  (Id. at 687.)
17  Finally, TRPA noted that the new Regional Plan amendments will
18  allow the Project to proceed, and the Project itself will help
19  attain multiple thresholds.  (Id.)

20    With respect to the ozone threshold, TRPA found that as
21  of the Report, the threshold was not in attainment.  (Id. at
22  688.)  The Report indicates that the proposed target date for

23

24    [41]    The Report is the result of TRPA's mandate to conduct a
25  comprehensive evaluation every five years of whether each
   threshold is being achieved and/or maintained and to make
26  specific recommendations to address problem areas.  (TAR 6616.)

27    [42]    TRPA's findings explain that it joined with 50 public
   and private organizations to help achieve the environmental
28  thresholds.  (TAR 685.) Over $1 billion has been invested in the
   program. (Id.)

1  compliance is 2015.  (Id. at 678.)  It notes that ozone precursor

2  emissions from the Project will not affect TRPA's efforts to

3  attain the ozone threshold because the Project's operational-

4  related emissions of NOx and ROG will not exceed the significance

5  threshold for these pollutants.  (Id. at 690.)  With respect to

6  the VMT threshold, TRPA found that as of the 2006 Report, the

7  threshold was not in attainment, but that there has been a

8  positive trend towards attainment.  (Id. at 693.)  It explained

9  that the VMTs produced by the Project will be effectively

10 mitigated through funds paid to the Mitigation Program.  (Id. at

11 694.)  It also referenced two analyses completed after

12 publication of the final EIR-EIS demonstrating that the Project

13 will actually not result in a net increase in VMTs.[43]  (Id. at

14 694-95; see also id. at 6587-95 ("ICF Memorandum"), 6596-99

15 ("Fehr and Peers Memorandum").)  Because ozone is affected by VMT

16 levels, the impact from air pollutant emissions on ozone levels

17 are likewise overstated in the EIR-EIS.  (Id. at 692.)

18         Plaintiffs argue that TRPA's findings lack evidentiary

19 support.  First they argue that neither VMT nor the ozone

20 precursors emissions will be adequately mitigated.  They next

21 object to TRPA's failure to address the effectiveness of the

22 compliance measures and programs and note that it is unclear

23

24       [43]  Plaintiffs challenge TRPA's reliance on these analyses
   to change the conclusions made in the EIR-EIS about the Project's
25 impacts.  (Pls.' Mem. at 41 n. 23.)  They also contest the
   study's conclusions.  (Pls.' Reply at 34:14 n.26.)  The Compact,
26 however, does not limit TRPA to relying on the EIR-EIS to support
   its findings.  TRPA expressly stated that its threshold findings
27 were based on the analyses in the record and the court will
   therefore consider these analyses in determining whether there is
28 substantial evidence for TRPA's findings.  See League, 739 F.
   Supp. 2d at 1281.

1   whether the supplemental measures are adopted and enforceable.

2   Finally, they suggest that any progress in attainment does not

3   show that the Plan and Code will achieve and maintain the

4   thresholds, and that regardless of any progress, TRPA must show

5   that it has an "effective plan" in place to achieve each

6   threshold.

7          The court does not read League as broadly as plaintiffs.

8   League does not require TRPA to develop a specific plan and prove

9   that it will be effective in meeting the thresholds.  Rather,

10  TRPA must conclude, based on substantial evidence, that it "has

11  adopted a course of action that will meet the targets."  See id.

12  at 1271.  Here, substantial evidence supports TRPA's conclusion

13  that the combination of the various recommendations in the

14  Report, the compliance measures, the EIP, the CEP, and the Plan

15  amendments is such a course.  Even though TRPA has not quantified

16  the effects of each contributing element, it has explained how

17  each will assist with achieving and maintaining the thresholds.

18  TRPA has no doubt exceeded the showing, found inadequate in

19  League, that the Plan as amended will not make things worse.

20  League, 739 F. Supp. 2d at 1269.  It has gone further and made

21  findings that the Plan and its related elements will make

22  progress to and eventually attain the thresholds.

23          Nor do plaintiffs' objections undermine this

24  conclusion.  As the court found above, VMT and cumulative ozone

25  impacts will be adequately mitigated through the Mitigation

26  Program.  Thus, the Project will not deter attainment of the air

27  quality thresholds.  This is also confirmed by the supplemental

28  report acknowledging that the EIR-EIS overstated the Project's

89

1   VMT effects.  Although the supplemental compliance measures and

2   programs appear not be mandatory, they are only part of the

3   numerous programs that TRPA has identified as helping it to

4   achieve and maintain the thresholds.  Again, TRPA also relies on

5   the EIP, the CEP, and the Regional Plan amendments as part of its

6   course of action to ensure that the Regional Plan is implemented

7   in a way that achieves and maintains the thresholds.

8   Accordingly, the court finds that substantial evidence supports

9   TRPA's findings that the Regional Plan and all of its elements

10  will achieve and maintain the air quality thresholds.

11  VII.  Noise Impacts

12        A.    Adequacy of the EIR-EIS's Analysis of Construction

13              Noise Impacts

14              1.    CEQA

15                    Under CEQA, an EIR must identify the "significant

16  environmental effects" of a proposed project.  Cal. Pub. Res.

17  Code § 21100(b)(1); Guidelines § 5126(a).  A "significant effect"

18  is "a substantial, or potentially substantial, adverse change in

19  the environment."  Cal. Pub. Res. Code § 21068.  "[A] lead agency

20  has the discretion to determine whether to classify an impact

21  described in an EIR as 'significant,' depending on the nature of

22  the area affected."  Mira Mar Mobile Cmty., 119 Cal. App. 4th at

23  493.  That determination "calls for careful judgment on the part

24  of the public agency involved, based to the extent possible on

25  scientific and factual data."  Guidelines § 15064(b).

26                    To determine whether an impact is significant, an

27  agency may rely on a "threshold of significance."  Guidelines §

28  15064.7(a).  Such a threshold can be "an identifiable

1  quantitative, qualitative or performance level of a particular

2  environmental effect." Id. § 15064.7(a).  Thresholds may be

3  drawn from existing environmental standards, such as other

4  statutes or regulations.  Protect The Historic Amador Waterways

5  v. Amador Water Agency, 116 Cal. App. 4th 1099, 1107 (3d Dist.

6  2004).  If the threshold is met, "the effect will normally be

7  determined to be significant."  Guidelines § 15064.7(a).

8        However, "[c]ompliance with the law is not enough to

9  support a finding of no significant impact under the CEQA."

10 CATS, 136 Cal. App. 4th at 17.  The EIR's discussion of impacts

11 must "provide[] sufficient information and analysis to allow the

12 public to discern the basis for the agency's impact findings.

13 Thus the EIR should set forth specific data, as needed to

14 meaningfully assess whether the proposed activities would result

15 in significant impacts." Id. at 13 (internal citations omitted).

16       Placer County's noise ordinance establishes a daytime

17 (7:00 AM to 10:00 PM) noise limit of 55 dBA, Leq, and a nighttime

18 (10:00 PM to 7:00 AM) noise limit of 45 dBA, Leq.  (AR 3963.)

19 Construction noise, however, is exempt from the daytime limit

20 between the hours of 6 AM and 8 PM Monday to Friday and between 8

21 AM and 8 PM on the weekend. (Id.)  TRPA likewise exempts noise

22 from construction activities between the hours of 8:00 AM and

23 6:30 PM. (Id.)  The EIR-EIS adopted the County's and TRPA's

24 noise ordinances as thresholds to determine if the noise impacts

25 associated with the Project's construction will result in a

26 significant impact. (Id. at 3411-12.)

27       The EIR-EIS determined that the noise impacts from the

28 Project's daytime construction activities were not significant

91

1   "[b]ecause of Placer County and TRPA's construction noise

2   exemptions during daytime activities." (<u>Id.</u> at 3963.)  However,

3   because nighttime construction activities could exceed the

4   County's noise ordinance, the EIR-EIS found a significant impact

5   and required mitigation measures to reduce construction noise to

6   a less than significant level.  (<u>Id.</u>)

7           Plaintiffs argue that by using the construction

8   exemption as a threshold, TRPA and the County did not

9   meaningfully consider the noise impacts of the project because it

10  was a foregone conclusion that they would not result in a

11  significant impact.  As a result, plaintiffs argue that

12  substantial evidence does not support the County's finding that

13  the Project's noise impacts are less than significant.  This

14  contention, however, is difficult to square with the extensive

15  analysis conducted in the EIR-EIS related to the Project's level

16  of daytime noise.  The EIR-EIS examined the noise impacts of the

17  Project's construction activity based on the "worst-case

18  scenario" in which the three loudest pieces of equipment would be

19  operating at the same time.  Under that scenario, noise levels

20  would likely reach 93 dBA, Leq, at 50 feet.  (<u>Id.</u> at 3411.)  For

21  the closest residences, 100 feet from the Project, noise from the

22  construction activities for the Project could reach up to 85 dBA,

23  Leq, and if pile drivers are used noise could reach up to 93 dBA,

24  Leq, at those residences, without taking into account acoustical

25  shielding or terrain.  (<u>Id.</u> at 3413.)  The EIR-EIS indicated that

26  construction would occur seasonally between May 2011 and December

27  2020 and would occur at particular locations for only a fraction

28  of the time.  (<u>Id.</u> at 3411.)

1          As part of its analysis, the EIR-EIS considered that
2     the impacts would be lessened by the noise reduction measures
3     imposed by the County's ordinance, as well as the mitigation
4     measure proposed because of the possibility that the construction
5     noise would exceed the County's nighttime restrictions.   The
6     County's noise ordinance requires that all construction equipment
7     be fitted with factory-installed muffling devices and be
8     maintained in good working order.  (See id. at 8972 (explaining
9     that for the Project's construction noise to be exempt from
10    daytime noise level requirements, HMR must comply the ordinance's
11    requirements); id. at 2820 (requiring regulatory compliance
12    measures, including shrouding or shielding of impact tools and
13    muffling or shielding intake and exhaust ports on construction
14    equipment).)

15         Mitigation Measure NOI-1C provides that JMA "shall
16    design and implement measures to reduce noise construction."  (AR
17    3415.)  JMA must prepare a noise control plan to identify
18    measures that can be employed to reduce construction noise.
19    (Id.)  The plan must include "enclosing or shielding
20    noise-generating equipment and locating equipment as far as
21    practical from sensitive uses."  (Id.)  The plan must be
22    implemented in a way to ensure that construction noises will not
23    exceed 45 or 55 dBA, Leq, during sensitive hours on both weekdays
24    and weekends.  (Id.)  Finally, TRPA and the County must approve
25    the plan prior to issuance of a grading permit.  (Id.)

26         Although there is no requirement in Mitigation Measure
27    NOI-1C that construction noise be reduced to any particular level
28    during the day, the measures and noise control plan it requires

93

are not limited to nighttime construction.  By its plain terms,
JMA is required to "implement measures to reduce noise from
construction."  (Id.)  There is no limitation on this imperative
or any suggestion that it would apply only to nighttime
construction.  While the plan must ensure that construction noise
does not exceed the thresholds at night, this standard does not
limit the general command of the mitigation measure to reduce
construction noise at all hours.

In Berkeley, the court reviewed challenges to an EIR
for an expansion of the Oakland airport.  91 Cal. App. 4th at
1350.  To determine whether the project would have a significant
effect on noise, the EIR relied exclusively on a fixed standard
of 65 CNEL.  Id. at 1373.  CNEL, or "community noise equivalent
levels," measures background noise levels based on a weighted
average of all measured noise over a twenty-four-hour period.
Id.  In commenting on the draft EIS, citizens complained and
several experts opined that its reliance on the CNEL metric
caused it to ignore "single-event" nighttime noise and to fail to
acknowledge citizens' sleep disturbances that such noise might
cause.  Id. at 1375-76.  The court explained that use of the CNEL
standard precluded "any meaningful analysis of existing ambient
noise levels, the number of additional nighttime flights that
will occur under the [project], the frequency of those flights,
to what degree single overflights will create noise levels over
and above the existing ambient noise level at a given location,
and the community reaction to aircraft noise, including sleep
disturbance."  Id. at 1382.  Given this oversight, the court held
that the potential noise impact of increased nighttime flights

94

1  required further study.  Id.

2        It may fairly be said that TRPA and the County used a
3  static, bright-line rule, like the CNEL standard in Berkeley, as
4  the significance threshold for daytime construction noise (the
5  exemption).  But, unlike in Berkeley, that reliance did not
6  preclude analysis of the potential impacts of the Project's
7  construction noise.  The analysis in the EIR-EIS is thorough and
8  carefully details the level of noise that will result from the
9  project.[44]  Nor did the use of the exemption as a threshold
10 preclude consideration of the particular setting in which the
11 noise will occur.  The EIR-EIS accounts for the particular
12 setting of the Project, explaining the "noise sensitive land
13 uses" that could be affected.  (Id. at 3397.)  It describes the
14 effects noise increases have on humans, (id. at 3392-95), and
15 details the noise levels at all times of day, not just during
16 non-exempt hours, (id. at 3411.)  It also explains the impact the
17 construction noise will have on residential homes.  (See id. at
18 3412.)  Given this analysis, the EIR-EIS "sets forth sufficient
19 information to foster informed public participation and enable
20 the decision makers to consider the environmental factors
21 necessary to make a reasoned decision."  Berkeley, 91 Cal. App.
22 4th at 1356.

23       Plaintiffs reliance on CATS is unavailing for similar
24 reasons.  In that case, the agency proposed a statewide pesticide

25

26       [44]    Each PAS sets "CNELs which shall not be exceeded by
   any activity or combination of activities."  Code § 23.3.  The
27 court addresses plaintiffs' argument regarding the EIR-EIS's
   failure to evaluate whether the Project's construction noise
28 would violate the noise threshold standards for the adjacent PASs
   in subsection C, infra.  (See Pls.' Mem. at 46:16-22.)

application program to control a pest threatening California's

grapevines.  CATS, 136 Cal. App. 4th at 5.  The court held that

in finding no significant impact based solely on the registration

of the pesticides to be used and the related regulatory program

in place, including safety regulations for employees handling

pesticides, the EIR failed to adequately analyze the possible

environmental effects of the specific uses of pesticides in the

program, especially as related to the particular chemicals to be

used, the amounts and frequency of their use, and specific

sensitive areas targeted for application.  Id. at 15-16.  The

court faulted the agency for "repeatedly deferr[ing] to the

[pesticide] regulatory scheme instead of analyzing environmental

consequences of pesticide use and therefore [falling] short of

its duty under CEQA to meaningfully consider the issues raised by

the proposed project."  Id. at 16.

          Unlike the agency's failure in CATS to conduct

independent analysis, TRPA and the County here did not rely on

the ordinance to exclude all examination of the Project's noise

effects; in fact, the EIR-EIS contains an extensive analysis, as

detailed above.  Moreover, the ordinances TRPA and the County

adopted as a significance threshold would have contemplated

regulating exactly the kind of noise that this project would

produce: that from construction in a residential area.  In

contrast, the breadth and scope of the pesticide application in

CATS involved the use of pesticides in a manner beyond that which

the existing pesticide regulations took into account.  See id. at

17 (explaining that the state pesticide regulation program was

not "intended to[] address the environmental impacts of

1  administering a statewide pesticide application program backed by

2  the full force of the DFA and the county agricultural

3  commissioners").

4        As a final matter, the court notes that this case is

5  unique among those cited by both parties in that the threshold

6  selected by TRPA and the County includes an exemption.

7  Plaintiffs argue that such a standard foreordains a finding of no

8  significant impact and therefore precludes consideration of the

9  Project's noise impacts, even though it may allow for disclosure

10 of these impacts.

11       "In exercising its discretion [to determine if an

12 impact is significant], a lead agency must necessarily make a

13 policy decision in distinguishing between substantial and

14 insubstantial adverse environmental impacts based, in part, on

15 the setting."  Mira Mar, 119 Cal. App. 4th at 493 (citing

16 Guidelines § 15064(b)); see also Nat'l Parks & Conservation Ass'n

17 v. Cnty. of Riverside, 71 Cal. App. 4th 1341, 1359 (1999) ("[T]he

18 standards for assessing impacts of a project require careful

19 judgment on the part of the public agency involved, based to the

20 extent possible on scientific and factual data; these standards

21 allow for a finding of an insignificant degree of impact, not

22 necessarily a zero impact.").  In Mira Mar, the court deferred to

23 the City's discretion to determine that, while blocking public

24 views would be a significant impact, the hindrance of private

25 views would not be considered as such.  119 Cal. App. 4th at 493.

26 These distinct significance thresholds for public and private

27 views resulted because the City had adopted the its land-use

28 policy, which embodied the distinctions.  Id. at 494.

1      As with the City's land-use policy, the noise

2  ordinances embody a reasonable policy determination, here with

3  respect to regulating noise.  <u>See also</u> <u>Nat'l Parks & Conservation</u>

4  <u>Ass'n</u>, 71 Cal. App. 4th at 1358 (upholding agency's choice to use

5  residential noise standards in parkland).  The exemptions in both

6  ordinances are coupled with specific noise limits for evening

7  hours.  This two-part approach to noise regulation appears to

8  reflect the conclusion that while it is crucial to have

9  quantitative limitations on noise occurring during nighttime

10  hours, construction noise occurring during daytime hours, even in

11  a residential locale, is intermittent and temporary and thus not

12  so disruptive as to give rise to a need for specific limits on

13  it.[45]  As did the City in <u>Mira Mar</u>, TRPA and the County

14  appropriately exercised their discretion to use the noise

15  ordinances, and the policy choice they encompass, to determine

16  whether the Project's construction noise would result in a

17  significant effect.  Further reason to believe that the noise

18  ordinances are an appropriate significance threshold stems from

19  the fact that daytime construction noise is only exempt if the

20  various requirements of the County's noise ordinance, such as the

21  use of muffling, are met.

22      Plaintiffs press that ultimately an exemption from

23  regulation is no standard at all and would allow for unlimited

24  construction noise.  While a theoretical possibility, that is not

25

26      [45]   Construction noise would not occur in the entire
27  Project area for nine continuous years, as plaintiffs suggest.
   (AR 3411.)  Instead, construction at each base will only occur
28  for five years; new construction is expected to take two years.
   (<u>Id.</u> at 4308, 5025.)

the case before the court.  The EIR-EIS did not attempt to evade consideration of the noise impacts from daytime construction, but instead clearly detailed those impacts and the factors that will limit them.  Accordingly, the court finds that the EIR-EIS properly fulfilled its obligation under CEQA to analyze the environmental impacts of the Project's construction noise and therefore substantial evidence supports the County's findings that the Project's noise impacts are less than significant.

        2.  <u>Compact</u>

     <u>League</u> again relied on NEPA caselaw to describe whether an EIS's analysis of a potential impact is sufficient under the Compact.  It stated that "[t]he court must ask whether the EIS took a 'hard look' at [a project's] potential impacts."  <u>League</u>, 739 F. Supp. 2d at 1289 (quoting <u>Robertson</u>, 490 U.S. at 352).  Assuming the Compact requires such a "hard look," the court does not consider this standard to require different or more analysis than that required by CEQA.  Thus, for the same reasons that the EIR-EIS's analysis of the Project's construction noise impacts was sufficient under CEQA, it is also sufficient under the Compact.  Likewise, TRPA's finding that the Project's construction noise impacts are less than significant is supported by substantial evidence.

    B.   <u>Adequacy of the EIR-EIS's Analysis of the Proposed Expanded Snowmaking System's Noise Impacts</u>

       1.  <u>CEQA</u>

     "The fundamental purpose of an EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely

1   to have on the environment.'" Vineyard Area Citizens, 40 Cal.

2   4th at 428 (quoting Guidelines § 21061).  As noted previously,

3   CEQA requires that an EIR adequately identify and analyze the

4   significant environmental effects of the proposed project.  Cal.

5   Pub. Res. Code § 21100; Guidelines § 15126(a).  This requirement

6   extends to any future expansion or other action if it is a

7   reasonably foreseeable consequence of the initial project and

8   will likely change the environmental effects of the initial

9   project.  Laurel Heights, 47 Cal. 3d at 396.

10        "CEQA requires a lead agency to prepare an EIR for a

11   project 'at the earliest possible stage,' yet, at the same time,

12   it recognizes 'additional EIRs might be required for later phases

13   of the project.'" Cal. Oak Found., 188 Cal. App. 4th at 271

14   (quoting City of Carmel-By-The-Sea v. Bd. of Supervisors, 183

15   Cal. App. 3d 229, 250 (6th Dist. 1986)).  CEQA therefore permits

16   a lead agency to use "tiering," which refers to the "coverage of

17   general matters and environmental effects in an [EIR] prepared

18   for a policy, plan, program or ordinance followed by narrower or

19   site-specific [EIRs] which . . . concentrate on the environmental

20   effects which (a) are capable of being mitigated, or (b) were not

21   analyzed as significant effects on the environment in the prior

22   [EIR]." Cal. Pub. Res. Code § 21068.5.  In other words, it

23   allows "the environmental analysis for long-term, multipart

24   projects to be 'tiered,' so that the broad overall impacts

25   analyzed in an EIR at the first-tier programmatic level need not

26   be reassessed as each of the project's subsequent, narrower

27   phases is approved." Vineyard Area Citizens, 40 Cal. 4th at 429.

28        The EIR-EIS explains that JMA proposes to expand

100

Homewood's snowmaking system from the current 23.8 acres of ski trails to a total of 102.3 acres, (AR 2773), and from ten snow guns to fifty-five.[46]  (Id. at 3426, 3673.)  A plan for the expanded system was submitted with the Project, although it did not indicate where the snow guns would be located.  (Id. at 35899-913.)  TRPA and the County have approved the Ski Area Master Plan, of which expanded snowmaking is a part.  (See id. at 2773 ("The existing snowmaking system will be upgraded to ensure adequate early and late season snowpack.").)  They have not approved, however, a specific snowmaking expansion plan and any expansion cannot go forward without further approval from TRPA and the County.  (Id. at 8236 (conditional use permit approved by the County); TAR 2197-2199 (permit granted by TRPA).)

        The EIR-EIS explains that "[b]ecause the number and type of guns as well as the location of each gun is currently unknown, the noise levels from snowmaking cannot be quantified."[47] (AR 3426.)  Instead, it describes the "worst-case scenario," in which the snowmaking system would operate every night of the ski season from midnight until 7:00 AM and for three continuous days for two weeks at the beginning of the season.  (Id.)  It then quantifies the noise created by three different guns used in Homewood's current snowmaking system at three different

---

[46]   Counsel for JMA repeatedly asserted at oral argument that Homewood currently uses twenty-one snowguns.  The record counsels otherwise: Homewood has "five guns operating at the north side and [five] guns operating at the south side . . . ." (AR 3426 (emphasis added).)

[47]   Plaintiffs note that defendants did in fact know how many snow guns are proposed to be included in the expanded snowmaking system.  (See AR 3673 ("The proposed snowmaking system requires installation of . . . 55 snow guns.").)

locations.  (Id. at 3409-10 (identifying noise levels for the
currently used snowmaking equipment).)  The EIR-EIS concludes
that because "[s]nowmaking currently exceeds noise standards at
the residential uses near the North and South Base areas" that
"new snowmaking activities that result in an increase in
snowmaking noise would result in a significant noise impact."
(Id. at 3964.)

        The mitigation measure adopted in the EIR-EIS to reduce
existing and proposed snowmaking noise levels to a less than
significant level requires JMA to reduce noise levels at Homewood
to meet adjacent PAS CNEL limits.  (Id. at 3428.)  JMA must
"prepare a noise control plan to design, construct/install, and
operate new snowmaking equipment so that the increase in noise
associated with snowmaking conditions . . . is reduced to meet
the appropriate PAS limit."  (Id.)  The plan must be approved by
TRPA and Placer County prior to HMR using any new snowmaking
equipment.  (Id. at 3878.)  The EIR-EIS lists that measures in
the plan may include, but are not limited to, setbacks, temporary
barriers between the noise source and noise-sensitive land uses,
selection of quieter snowmaking equipment, prohibiting or
minimizing the operation of snowmaking activities during
nighttime hours, reducing the amount of snowmaking equipment
operating concurrently, and reducing the number of nozzles near
noise sensitive land uses.  (Id. at 3428-29.)  Acoustical studies
are required at the time specific designs are submitted to ensure
compliance with the CNEL limits.  (See id. at 3964.)  The EIR-EIS
finds that after mitigation, the snowmaking system's noise would
meet the adjacent PAS CNEL limits.  (Id. at 3429.)

1    The parties do not dispute that the potential

2  environmental effects of expanded snowmaking had to be analyzed

3  in the EIR-EIS because that expansion is a reasonable future

4  phase of the Project.  Plaintiffs argue that the EIR-EIS failed

5  to adequately analyze the expanded snowmaking's noise effects by

6  improperly deferring their consideration, while defendants

7  contend that the level of analysis conducted was sufficient for a

8  program-level EIR.  Defendants also rely on their claim that

9  further environmental review is required before the snowmaking

10 expansion is approved, which would address any insufficiencies in

11 the EIR-EIS's analysis of the expansion's noise effects.

12    Plaintiffs depend largely on Stanislaus National

13 Heritage Project v. County of Stanislaus, 48 Cal. App. 4th 182

14 (5th Dist. 1996), to argue that defendants' improperly deferred

15 analysis of the snowmaking expansion's noise effects.  The EIR

16 under review in that case did not identify the significant

17 impacts of supplying water beyond the first five years for a

18 twenty-five year development project of an almost 30,000-acre

19 destination resort and residential community.  Id. at 188, 195.

20 The EIR concluded that until sources for the water are

21 identified, the project's water requirements would be considered

22 a significant impact.  Id. at 195.  The proposed mitigation

23 measure for this significant impact was to forbid approval of

24 development requiring over 1,200 acre-feet per year of water

25 until adequate water supplies were made available and the

26 environmental impacts of the sources were studied and mitigated

27 per CEQA.  Id. at 195.  The EIR also required additional

28 environmental review of further water acquisition projects.  Id.

103

1  at 195.

2         The EIR never identified, however, the specific
3  environmental impacts of procuring the water.  The court found
4  the EIR's analysis insufficient under CEQA because the
5  "environmental consequences of supplying water to th[e] project
6  would appear to be one of the most fundamental and general
7  'general matters' to be addressed in a first-tier EIR."  Id. at
8  199 (quoting Cal. Pub. Res. Code § 21068.5).  In other words,
9  "[t]o defer any analysis whatsoever of the impacts of supplying
10 water to this project until after the adoption of the specific
11 plan calling for the project to be built would appear to be
12 putting the cart before the horse."  Id. at 200.

13        The court agrees with plaintiffs that snow is to a ski
14 resort as water is to a resort and housing development; that is,
15 essential.  But counsel for JMA repeatedly emphasized at oral
16 argument that it was prepared to proceed with the Project whether
17 or not the proposed snowmaking expansion is eventually approved
18 by TRPA and the County.  While snow is undoubtedly necessary to
19 the Project's success, JMA asserts that even after the Project's
20 expansion of Homewood, the mountain will have sufficient snow
21 with what nature and its current snowmaking system provides to
22 operate.  It characterized the expanded system as "insurance" to
23 ensure an adequate snowpack and well-maintained runs, rather than
24 a necessity.

25        Had JMA depended on an extended ski season for the
26 Project's economic feasibility, the expanded snowmaking system
27 might be viewed as essential to the Project.  The financial
28 calculations prepared for the Project, however, do not rely on

extending the ski season to ensure the Project's economic
viability.  Thus, while deferral was inappropriate in <u>Stanislaus</u>
because the project could not function without water, it is not
inappropriate here for that reason because the Project <u>can</u> go
forward without expanded snowmaking.  JMA's assertions on this
point should alleviate plaintiffs' fear that approval of expanded
snowmaking is inevitable because the Project might be infeasible
without it.

Deferral was also not inappropriate here because TRPA
and the County should be found to have already approved the
expanded snowmaking system.  CEQA permits agencies "to use
'tiering' to defer analysis of certain details of later phases of
long-term or complex projects until those phases are up for
approval."  <u>Cal. Oak Found.</u>, 188 Cal. App. 4th at 271 (internal
quotation marks and citation omitted).  Contrary to plaintiffs'
suggestions, while the Project (the ski area master plan) has
been approved, the expanded snowmaking system has not received
final approval.  It is not included in the permits approved by
TRPA and the County.  (<u>See</u> TAR 2197-99; AR 8236.)  The expansion
<u>cannot</u> be built until JMA presents to TRPA and the County a noise
control plan that will reduce the system's noise effects to
within the appropriate PAS limits.  (<u>Id.</u> at 3878.)

Nor was deferral inappropriate because a full analysis
of the expanded snowmaking system's increased noise levels should
be found to have been feasible.  "A basic tenet of CEQA is that
an environmental analysis 'should be prepared as early as
feasible in the planning process to enable environmental
considerations to influence project program and design and yet

late enough to provide meaningful information for environmental
assessment.'" <u>Laurel Heights</u>, 47 Cal. 3d 376 at 395; <u>see</u>
Guidelines § 15151 ("[T]he sufficiency of an EIR is to be
reviewed in the light of what is reasonably feasible."). "The
degree of specificity required in an EIR will correspond to the
degree of specificity involved in the underlying activity which
is described in the EIR." <u>Id.</u> § 15146.  The EIR-EIS's program-
level analysis of the expanded snowmaking system's noise effects
meets these standards.

The preliminary designs for the snowmaking expansion
provide some important details, such as proposing locations for
features like pipeline and hydrants.  (AR 35877.)  As the EIR-EIS
explains, however, final plans for the snowmaking system have not
been engineered, and other important details such as the location
and type of snow guns, as well as noise control measures, have
not been finalized.  (<u>See</u> <u>id.</u> at 35913.)  Plaintiffs suggest that
the snow guns would presumably have to be placed relatively close
to the electrical outlets, which are to be located near the
hydrants, whose location has been designated.  (<u>See</u> <u>id.</u> at 32520
(explaining that an electrical outlet will be next to each
hydrant to plug the snow guns into).)

As counsel for JMA explained at oral argument, however,
determining the precise location of the snow guns is important
because natural features have a significant impact on the noise
produced by the snow guns.  The other undetermined factors, such
as the type of snow guns to be selected and noise control
measures, also have significant impacts on the expanded
snowmaking's noise levels.  Given these uncertainties, the EIR-

106

1  EIS conducted the level of analysis that was feasible by

2  quantifying the noise of the current snowmaking system and

3  explaining when snowmaking would occur with the expanded system.

4  (See id. at 3409-10); cf. L.A. Unified Sch. Dist. v. City of Los

5  Angeles, 58 Cal. App. 4th 1019, 1028 (2d Dist. 1997) (noting that

6  an environmental impact issue should be considered when the

7  "agency preparing the plan has 'sufficient reliable data to

8  permit preparation of a meaningful and accurate report on the

9  impact' of the factor in question" (quoting Laurel Heights, 47

10  Cal.3d at 396)).

11         Instead of improper deferral, the EIR-EIS relies on

12  proper tiering.  Tiering is described by California courts as

13  "used to defer analysis of environmental impacts and mitigation

14  measures to later phases when the impacts or mitigation measures

15  are not determined by the first-tier approval decision but are

16  specific to the later phases." Vineyard Area Citizens for

17  Responsible Growth, Inc., 40 Cal. 4th at 431.  "For example, to

18  evaluate or formulate mitigation for site specific effects such

19  as aesthetics or parking . . . may be impractical when an entire

20  large project is first approved; under some circumstances

21  analysis of such impacts might be deferred to a later tier EIR."

22  Id. at 431 (internal quotation marks and citation omitted).

23  Here, defendants found that the proposed expanded snowmaking

24  system's noise effects would be significant and preceded to

25  identify a mitigation measure that would reduce the effect to a

26  less than significant level.  Given the uncertainties about the

27  expanded snowmaking system and the lack of final engineered

28  plans, the EIR-EIS is not inadequate for not going a step further

1  at the program-level of analysis to conduct a full study or make

2  estimates of the increased noise levels the system will produce.

3       Plaintiffs next contend that there is no guarantee that

4  additional environmental review of the snowmaking expansion's

5  noise impacts will actually occur.  The County's conditional use

6  permit for the Project states that the snowmaking system will

7  "require subsequent environmental review prior to development."

8  (AR 8236.)  Plaintiffs note, however, that while the EIR-EIS

9  clearly makes a commitment to further analyze the water impacts

10  of the expanded snowmaking system, which must be considered in

11  conjunction with the Project's water needs a whole, it fails to

12  do so for its noise impacts.  The EIR-EIS requires JMA to provide

13  "a detailed Water System Engineering Report . . . [that shall]

14  describe the necessary infrastructure required by the serving

15  water provider to meet the Proposed Project's domestic, fire

16  protection, and snow making water demands."  (Id. at 3985.)  It

17  must produce this plan "prior to approval of Improvement Plans

18  for any portion of the HMR MP Phase 1 development."  (Id.)

19  Furthermore, the hydrology section of the EIR-EIS states that

20  "[s]nowmaking is proposed as a programmatic-level project

21  component and will require further environmental review prior to

22  project conditioning and/or approvals."  (Id. at 3643.)

23       Although there is no comparable commitment to further

24  environmental analysis of the snowmaking system's noise effects

25  in the EIR-EIS, CEQA requires such review.  Regarding subsequent

26  environmental review when an agency relies on tiering, the

27  Guidelines provide that "[i]f a later activity would have effects

28  that were not examined in the program EIR, a new initial study

1   would need to be prepared leading to either an EIR or a negative

2   declaration." Guidelines § 15168(c)(1). Because the Project

3   used a tiered EIR-EIS, it is subject to this provision and must

4   provide additional environmental review if any of the snowmaking

5   system's effects have not been adequately studied. Defendants

6   also emphasize that further environmental review will occur

7   because the mitigation measure for snowmaking's noise effects

8   requires TRPA and the County to approve JMA's noise control plan

9   before the snowmaking expansion can be constructed. (AR 3428.)

10          Plaintiffs last press that without quantifying the

11  snowmaking expansion's expected increase in noise levels, there

12  is no basis for the EIR-EIS's conclusion that the Project's

13  snowmaking noise impacts will be reduced to meet the PAS noise

14  limits. They argue that this is especially so because the

15  Homewood resort already violates those limits. (See id. at

16  3397.) In Laurel Heights, a neighborhood association challenged

17  the finding of mitigation for a building's noise impacts when the

18  major source of the noise--ventilation fans--had not been studied

19  or quantified. 47 Cal. 3d at 418. The EIR explained that:

20          The noise from these fans can be calculated once the
            systems are designed and the fans selected. Specific
21          noise control treatments including fan silencers, barrier
            walls, or baffled enclosures will then be evaluated if
22          predicted levels exceed the performance standards. The
            equipment design will be reviewed by a qualified
23          acoustical engineer for compliance with the noise
            performance standards.
24

25  Id. (internal quotation marks omitted). The Laurel Heights court

26  found this analysis of mitigation to be sufficient, despite the

27  EIR's failure to quantify the probable noise the fans would

28  produce and the not yet finalized mitigation plan intended to

                                  109

ensure that the fans' noise would be reduced to a less than

significant level.  See id.

The present case is very similar to Laurel Heights.
Although the snow guns for the expanded system have not yet been
selected and their noise levels at different locations around the
Resort once installed not yet quantified, JMA must present a
noise control plan that shows the expanded snowmaking system's
noise levels are in compliance with the PAS limits before the
County and TRPA can approve the system.[48]  (AR 3428, 3878.)
Acoustical studies are also required at the time final designs
are submitted to ensure compliance.  (Id. at 3964.)  As did the
court in Laurel Heights, the court likewise determines here that
the EIR-EIS adequately shows that the mitigation measure will
reduce the expanded snowmaking's noise impacts to a less than
significant level.  And although "a mitigation measure cannot be
used as a device to avoid disclosing project impacts," the EIR-
EIS made no such ploy.  San Joaquin Raptor Rescue Ctr., 149 Cal.
App. 4th at 663-64.  It identifies the expanded snowmaking
system's noise impacts as significant and, by relying on tiering,
commits to further environmental review of the expansion.  The
fact that the mitigation measure for snowmaking's noise impacts

[48]  The mitigation measure is not defective because JMA
will work from a non-exclusive list of measures to devise a noise
control plan subject to TRPA's and the County's approval.  "[F]or
[the] kinds of impacts for which mitigation is known to be
feasible, the EIR may give the lead agency a choice of which
measure to adopt, so long as the measures are coupled with
specific and mandatory performance standards to ensure that the
measures, as implemented, will be effective."  CBE, 184 Cal. App.
4th at 94.  The snowmaking expansion's noise levels must comply
with the PAS limitations.  And, here, an even stronger medicine
exists than in the usual case: the mitigation measure must prove
to be effective or the expansion will not be approved.

1   is intended to reduce those impacts to a less than significant

2   does not diminish those other factors.

3        In sum, the EIR-EIS did not improperly defer analysis

4   of the snowmaking expansion's noise impacts.  Its program-level

5   analysis provided "'detail sufficient to enable those who did not

6   participate in its preparation to understand and to consider

7   meaningfully the issues raised by the proposed project.'"  Dry

8   Creek Citizens Coal., 70 Cal. App. 4th at 26 (quoting Laurel

9   Heights, 47 Cal.3d at 405).  Thus, the EIR-EIS's analysis of the

10  expanded snowmaking system neither violated CEQA, nor precluded

11  the County's finding that the mitigation measure will effectively

12  reduce the expanded snowmaking system's noise effects to a less

13  than significant level.

14        2.  Compact

15        Again assuming that the Compact requires the EIR-EIS

16  to take a "hard look" at the Project's snowmaking noise impacts,

17  the EIR-EIS's analysis is sufficient under the Compact for the

18  same reasons the court finds it to be sufficient under CEQA.

19  Additionally, TRPA's finding that the Project's increased

20  snowmaking noise will be mitigated to a less than significant

21  level in reliance on the EIR-EIS's analysis did not violate the

22  Compact for the same reasons the Compact's comparable finding did

23  not violate CEQA.

24        C.  Validity of TRPA's Noise Threshold Findings

25        Whenever TRPA amends the Regional Plan, it must find

26  "that the Regional Plan, as amended, achieves and maintains the

27  thresholds."  Code § 6.4.  Likewise, when it amends the Code, it

28  must find that that "the Regional Plan, and all of its elements,

111

as implemented through the Code, Rules, and other TRPA plans and programs, as amended, achieves and maintains the thresholds." Code § 6.5.  The Project area and surrounding areas are currently not in attainment with the local PAS CNEL limits due to traffic and snowmaking noise.  (TAR 732.)  Noise from traffic and snowmaking is expected to increase under the Project.  (Id.) Despite this, TRPA found that the Project will assist TRPA in attaining the noise thresholds.  It explained that "Mitigation Measure NOI-2 would reduce traffic noise relative to existing and future no-project conditions, and Mitigation Measures NOI-3a and NOI-3c would reduce snowmaking noise to PAS CNEL levels."  (Id. at 732-33.)

There is substantial evidence in the record to support TRPA's finding that the amendments to the Plan and Code will achieve and maintain the noise threshold.  The court found that TRPA adequately studied the noise impacts due to the Project's construction and the proposed snowmaking expansion, and that TRPA properly concluded that the adjacent PAS standards will be met by Homewood because the mitigation measure for expanded snowmaking requires as much.  Moreover, even if expanded snowmking is not approved, Mitigation Measure NOI-3c still applies.  It provides that "HMR must reduce noise levels to meet adjacent PAS CNEL limits.  The reduction of noise to PAS CNEL levels shall be reevaluated annually to ensure that HMR is implementing all possible snowmaking measures available to work towards the attainment of the PAS CNEL noise standards . . . ."  (AR 3878.)

Even if plaintiffs have not exhausted their argument that the Project's daytime construction noise would violate CNEL

112

1  standards, thereby precluding TRPA from finding that the

2  amendments required for the Project achieve and maintain the

3  noise thresholds, the court finds that it has no merit.  Although

4  construction noise will temporarily result in violations of the

5  noise thresholds for the Project area, TRPA has found that the

6  Project, when completed, will assist with achieving the noise

7  thresholds because it will reduce noise relative to current

8  conditions.  Thus, substantial evidence supports TRPA's

9  conclusion that the amendments to the Regional Plan and Code

10 achieve and maintain the noise thresholds.

11 VIII.    <u>Conclusion</u>

12         With respect to the EIR-EIS's analysis of Alternative

13 6 and to TRPA's and the County's findings that Alternative 6 is

14 economically infeasible, plaintiffs' motion for summary judgment

15 is GRANTED as to all defendants, and defendants' cross-motions

16 for summary judgment are DENIED.  In all other respects,

17 defendants' cross-motions for summary judgment are GRANTED and

18 plaintiffs' motion for summary judgment is DENIED.  This does not

19 necessarily mean that the Project or some version of it may not

20 go forward at some point in time.  However, before it does, TRPA

21 and the County must ensure that a legally adequate EIR-EIS has

22 been certified and the necessary findings under CEQA and Compact

23 have been made.

24         IT IS THEREFORE ORDERED that TRPA and the County shall

25 not begin any construction of the Project without the

26 preparation, circulation, and consideration under CEQA and the

27 Compact of a legally adequate EIR-EIS with regard to Alternative

28 6 and adoption of the appropriate findings required by CEQA and

113

1    the Compact.

2           The clerk shall administratively close this file, which

3    may be re-opened upon the application of any party upon a showing

4    of good cause.

5    DATED:    January 4, 2013

6

7    _____
     WILLIAM B. SHUBB
8    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

114